UTICA,
July, 1838.

The People
v.
Rector.

## THE PEOPLE vs. RECTOR.

Where the general moral character of a witness is impeached, whether by witnesses called for that purpose, or on his own cross-examination, it is competent for the party calling him to adduce testimony, in support of his character, for truth and veracity, so that the jury may pass upon his credibility.*

The mere contradiction of a witness, affords no ground for calling testimony in support of his character.

On the trial of an indictment for murder, where there is no pretence that the prisoner killed the deceased, while engaged in a riot or other misdemeanor, not amounting to a felony, by misadventure, but the death ensued in consequence of an intentional violence upon the person of the deceased, whether the prisoner designed to kill or not, he is not entitled to have the jury instructed, that they cannot convict of murder, if they should come to the conclusion that the mortal wound was inflicted in committing, or attempting to commit an offence, which of itself is less than a felony.

Homicide, occasioned by committing or attempting to commit a misdemeanor, though murder at the common law, is by the revised statutes reduced to manslaughter, in the first degree.

On a trial for murder, where it appeared that the deceased sought to gain admittance into a house of ill fame by violence, and against the will of the keeper thereof, who made an attack upon the aggressor, and death ensued, it was held, that testimony that threats had been made a week previous to the assault by persons who had broken into the house, that they would return some other night and break in again, might be received and submitted to the consideration of the jury, under the instruction of the court, although, it seems, that for the rejection of such evidence, where it was not shown that the deceased was of the party who made the threats, a new trial would not be granted.*

A witness is not obliged to answer, when his answer will subject him to a penalty, or will tend to degrade his moral character; the practice of compelling an answer in the latter case, seems however by the modern cases to be gaining ground.

Where a witness is sought to be impeached on a cross-examination, his answer if favorable to himself, is conclusive against the party.

It seems that proof of the good character of subscribing witnesses to a will, who are dead, and to whom fraud is imputed in the procuring or execution of the will, is admissible to repel the imputation; but it seems that this rule would not be extended, in respect to other instruments.

The examination of a witness taken on the arrest of a criminal, is admissible

---

*See dissenting opinion of Judge BRONSON, upon first and fifth propositions above.

UTICA,
July. 1838.

The People
v.
Rector.

in evidence in support of his testimony, where the witness is sought to be impeached on the ground of inconsistent relations of the matter in question.

The opinions of witnesses as to the improbability of a blow having been given from which death ensued, judging from the relative positions of the parties as stated by witnesses, are not admissible in evidence.

The refusal to recall a witness to re-state his testimony, after a cause has been summed up and the jury charged, is a matter of discretion appertaining to the court before whom the trial is had; with the exercise of which a court of review will not interfere.

The question put to an impeaching witness, may be, whether he knows the general character of the former witness, and from such knowledge, would believe him on oath; though the narrower form of enquiry, ' what is his character for truth and veracity,' is preferable as being more direct; and in either case the witness may be required to declare, whether the character, as known to him, is so very bad, that in his opinion the witness is utterly unworthy of credit on oath. Per COWEN, J.

TRIAL FOR MURDER. The prisoner was indicted for the murder of Robert Shepherd. The prisoner kept a bawdy house in the city of Albany. On the night of the eleventh day of March, 1838, between the hours of twelve and one o'clock, the deceased and two other persons, of the names of Wilson and Whitney, went to the house of the prisoner. Whitney being in advance of the others, knocked at the door to gain admittance, and was told by the wife of the prisoner, that he could not be admitted. After being so told, the deceased and Wilson came up. Wilson said he would try, and they knocked at the door. The prisoner then appeared at a window, told them they could not be admitted, and refused to open the door. Wilson, who was somewhat intoxicated, replied that he would be damned if he did not think he would come in, and immediately walked away some fifteen or twenty feet, to obey a call of nature. It was not fully proved that there was any knocking at the door, after Wilson uttered the above expressions; the testimony was contradictory as to the number of knocks given at the door, the loudness of the knocks, and as to the extent of violence committed at the door; some of the witnesses stating that the knocking and kicking at the door was so violent as to shake the house, which was a wooden building. After Wilson left the door, the deceased and Whitney went off of the stoop in front of the door and stood on the side-walk, the deceased in front of the door, and Whitney three or

four feet from him. The prisoner came out with the *door bar* of the door raised over his shoulder in both his hands, and struck the deceased one blow on the head, and knocked him down. He was taken by his companions to a surgeon's office, and in the course of the day died. There was a *post mortem* examination, and the surgeons testified that they found a gash on the *front* part of the right side of the head of the deceased, which did not go through to the bone, and after peeling the scalp they found a fracture crossing obliquely the line of the front wound, and extending back on the right side of the head; on the *back* part of the head above the ear, a part of the skull was depressed and broken in several parts. The latter wound in their opinion caused the death of the deceased, and that the blow which made the gash in the scalp, would not have caused it. They further testified that the force which caused the gash in front, did not cause the fracture of the skull, and that there must have been *two* forces applied. All the counts in the indictment charged the death to have been caused by a blow inflicted by the prisoner with the door bar, which was described to be a piece of white pine wood about three feet four inches long, two and half inches wide, and one inch thick.

One of the questions litigated on the trial was whether the prisoner struck the deceased *more than one blow*, the counsel for the prisoner insisting that the wound on the back of the head of the deceased must have been received in his falling upon the curb stone of the street or some other hard substance, and that a second blow could not have been inflicted by the prisoner unless he had gone on to the side-walk, which they insisted he did not do ; and it was conceded by the counsel for the prosecution that if the deceased received the injury upon the back of the head *from falling upon a curb stone* or other hard substance, that the prisoner could not be convicted under the indictment upon which he was tried. Charles Radliff, a witness for the prosecution, testified that he was in the house of the prisoner and saw him go out of it with the bar and strike a blow whilst standing on the stoop or on a step leading from the stoop, after which

he stepped on the side-walk going a little to the west (the street on which the house was situate running east and west and descending towards the east) when the witness saw the deceased lying on the side-walk and saw the prisoner raise the bar again in both his hands, on his left shoulder, with the intent *as he supposed to strike* Whitney, who run out into the street ; the prisoner then ascended the steps from the side-walk and came into the house. This witness said that he could not testify whether the prisoner did or did not inflict a second blow upon the deceased. Whitney testified that previous to his running into the street, the prisoner was *on the stoop*, his club up in the act of pressing forward ; when he turned round he saw him going into the door of the house. He concurred with Radliff in stating that after the deceased was knocked down, the prisoner immediately raised the bar again in both hands, over his left shoulder, and *as he supposed with the intent to strike him (the witness.)* He and Wilson concurred with Radliff in saying that they neither saw or heard a second blow given. It was a very clear moonlight night. The side-walk was 16 feet 2 inches wide from the house to the curb stone ; the platform or stoop in front of the house was 3 feet above the side-walk, descended to the side-walk by three steps, and extended, i. e. platform and steps, 5 feet 10 inches from the door of the house on to the side-walk. The deceased on receiving the blow fell toward the east diagonally across the side-walk on his left side ; his head lay 5 or 6 feet from the curb stone, but nearer it than the stoop or steps thereof ; he lay extended at his length with his head down hill and his feet towards the prisoner. The surgeons who attended the *post mortem* examination testified, that from the positions of the deceased and the prisoner as described by the witnesses, the prisoner could not have struck a second blow upon the head of the deceased, upon the part where the skull was depressed without passing off the platform and steps on to the side-walk west of the legs of the deceased. The surgeons all agreed that the fatal wound might have been inflicted with the door-bar, that it was the proper instrument to have made such a depression and frac-

ture as the head of the deceased exhibited ; three of them agreed that it might have been inflicted as he was falling, but a fourth said that it could not have been so, unless the prisoner was upon the side-walk.

After the surgeons had testified, the counsel of the prisoner, for the purpose of raising the presumption that the fatal wound was received by the deceased by striking his head against the side-walk or some hard substance at the time he fell from the effect of the blow struck by the prisoner, offered to prove by Henry Rector, a practical architect and engineer, that if the deceased stood upon the side-walk immediately in front of the steps, and upon the lower step, and when he fell with his head 2 or 3 feet or from 18 inches to 2 feet nearer to the curb stone than where his feet stood, and fell upon his left side, with his face inclined down, and the side of his face and head lying upon the pavement, that the prisoner could not in the opinion of the witness, have struck him in the direction the fatal blow was supposed, or described, to have been given, without advancing down the steps and towards the curb stone *further* than the feet of Shepherd, or in other words passing so as to be in the rear of him. The testimony thus offered the court refused to receive, and the counsel for the prisoner excepted.

On the part of the prisoner, a witness named Matthew Gillespie testified that he was in a house adjoining the house of the prisoner, and on hearing the knocking at the prisoner's door, raised his window, looked out, and saw the prisoner come out at the door on to the stoop, and saw him strike the deceased ; that after the prisoner struck, he turned round and went into the house ; that the prisoner *did not go off the stoop*, and that *he struck but one blow*. On his cross-examination he testified that he had a wife and children in the *fifth* ward of the city, but that for the last two years he had lived in adulterous intercourse with a woman who was with him on the night in question, and that during all that time he had slept and eat in the house wherein he then was, which was in the *second* ward of the city ; that he was in the habit of frequenting porter houses at unseasonable hours, and that during the last two years he

had been in no business, and had lived upon a fund of from three to five hundred dollars which he had before accumulated, and if he had paid his debts he would have had but little if any money. The counsel for the prisoner objected to his being cross-examined as to these facts. The court instructed him that he was not bound to answer any questions tending to disgrace himself, unless he chose so to do, to which he answered that he "had as lieve tell as not." The counsel for the prosecution, after proving by two witnesses that Gillespie had, previous to giving his testimony, disavowed all knowledge of the transaction, and contradicting his testimony in other respects, called one Britton B. Tallman as a witness, and inquired of him as to the general character of Gillespie for truth and veracity; to which he answered that he knew nothing against it, never having heard his character for truth called in question. The counsel for the prisoner then called a witness, and avowed their object to adduce testimony to maintain the character of Gillespie, and offered to prove by the witness and by several others then present, that *his general character for truth* stood perfectly fair, and that they would give as full credit to his testimony as to that of any other individual. The court excluded the testimony offered, and gave their opinion that as the witness called and examined to impeach the character of Gillespie for truth, had not impeached it, the prisoner's counsel might go into proof of the *general good character* or *good moral character* of the witness, but that they were not at liberty to confine the inquiry to his *character for truth only*. To this decision the prisoner's counsel also excepted.

The counsel for the prisoner also offered to prove that the house of the prisoner had been attacked on Saturday night, a week previous to the transaction in question, by several persons, and broken into, and the inmates very badly abused; and that they threatened to return some other night soon after, and break in again if they were not admitted. The counsel avowed that this proof was offered to show that the prisoner *had reason to apprehend violence upon his house* at the time that the deceased and his companions came

there, and that that was his reason for using so much force
as he did. It had been before proved by a witness for the
prisoner, that of those whom they had admitted as guests at
the house of the prisoner, some were rioters. This testimony
was also rejected by the court, and the counsel for the
prisoner excepted.

Radliff, one of the witnesses for the prosecution, having
testified that the prisoner at the bar, after inflicting a blow
upon the deceased, *was upon the side-walk*, James McKown,
Esq., one of the counsel for the prisoner, testified that he
was present at the *examination* of Radliff before the police
magistrate, upon the arrest of the prisoner, and that Radliff
then testified that the prisoner *was not on the side-walk* on
the night in question. Mr. McKown was supported by the
evidence of one of his associate counsel. To rebut which
evidence the *examination* of Radliff taken before the police
magistrate was read in evidence, which contained nothing
on the subject of the prisoner *being off of the stoop*. The
police magistrate testified that he believed the question was
put to Radliff whether he saw the prisoner off the stoop
and on the side-walk, but he did not recollect the answer
given. The counsel for the prisoner excepted to the admis-
sion of the examination in evidence.

After the court had charged the jury, and stated the
testimony of Mr. McKown, the counsel for the prisoner
requested to have Mr. McKown re-called to repeat the testi-
mony given by him in reference to the declarations of Radliff
before the magistrate. During the summing up of the
counsel, there had been a discussion between them in re-
spect to the testimony of Mr. McKown, and the minutes of
the circuit judge were then read by him, as he subsequently
stated the testimony in his charge. No application was
then made to have the witness re-called, and the court now
refused to have him called.

The counsel for the prisoner then requested the court to
charge the jury that if they should come to the conclusion
that the prisoner inflicted the mortal wound in an attempt
to commit an offence which of itself was less than a felony,
then he should not be convicted of murder; which the cir-

cuit jndge declined to do, on the ground that such charge would be inapplicable to the case. He had previously in his charge to the jury, stated the specific language of the revised statutes which defines the crimes of murder and manslaughter in their several degrees. The jury found the prisoner guilty of *murder*. Exceptions having been taken, the sentence was suspended, and the indictment and bill of exceptions were removed into this court by *certiorari*. The prisoner was brought up by *habeas corpus*, and an application made in his behalf for a new trial.

*H. G. Wheaton & A. L. Jordan*, for the prisoner.

*R. W. Peckham & S. Stevens*, for the people.

After advisement, the following opinions were delivered :

By COWEN, J. The case presents, in all, a series of six exceptions, three of which we feel no difficulty in saying, can not be sustained. These respect the *rejection* of Henry Rector's opinion, the *refusal* to recall Mr. McKown the witness, and the *admission* of the deposition of Radliff.

Henry Rector was not within the rule which receives the opinion of experts in matters of skill or science. Although a practical architect and engineer, there was nothing in the case put to him which had any connection with his professional business or observation, more than that of any other man. He might have gone through life without once having his attention called to the juncture of circumstances upon which his opinion was required. A farmer or merchant sitting *as a juror* would not, in common presumption, be at all behind him, in the capacity to draw a correct conclusion from the facts supposed. We think this office belonged exclusively to the jury. In *Ramadge v. Ryan*, 9 Bing. 333, TINDALL, Ch. J. said, " witnesses skilled in any " art or science, may be called to say what, in their judg- " ment, would be the result of certain facts submitted to " their consideration ; but not to give an opinion on things " with which a jury may be supposed to be equally well

" acquainted." And on the trial of Goodwin for manslaughter, at the March general sessions in New York, A. D. 1820, the late Mr Colden, who was then mayor, presiding, it was decided that a physician may with propriety be called to show the position, direction and extent of a wound, and the obstacle an instrument might meet with in its progress. But whether in a certain relative position, and in a particular manner, or by a particular motion, certain muscular strength would be equal to the infliction of a certain wound, was a more proper matter for the jury upon the facts. 5 City Hall Rec. 11, 25 and 26. In Selfridge's trial, Parker, J. held that though a physician might state his opinion as to the effect of a wound, he could not as to the force of a blow, and other matters, such as whether a man receiving a wound which caused his death in five or six minutes, could have sufficient strength left to give a blow which would have a certain effect, were overruled, as matters of conjecture on the facts, which should go to the jury. Selfridge's trial, 2nd ed. Boston, 1806, p. 60, 61.

The question as to the propriety of re-calling Mr. M'Kown we think rested in the discretion of the court below. The witness had been fully examined and dismissed from the stand. It could not after this, be claimed as a matter of right that he should be re-examined even to a new fact, much less one in respect to which he had already answered. It may be, and many times is important that this should be done, and it is often allowed ; but the judges at the trial are more competent to declare when it shall be refused, than a court of error can be. There are several satisfactory reasons for the refusal, apparent on the bill of exceptions in this case; one, that it is extremely difficult to detect any material difference between the testimony as stated by the court, and that claimed by the counsel ; and another, that the subject having been before debated in the course of the summing up, the court had then pronounced the claim of counsel to be wrong, in which he acquiesced, without proposing any correction by the witness. But we prefer putting the case on a ground which shall supersede the neces-

UTICA,
July, 1838.

The People
v.
Rector.

sity for such explanations. And we accordingly adopt the rule laid down and explained by Mr. Senator Beardsley, in *Law* v. *Merrills*, 6 Wendell, 280, 1, as in the main perfectly correct. It is, that the court below having a discretion, error does not lie, unless the discretion has been grossly abused. *Duncan* v *M'Collough*, 4 Serg. & Rawle, 480, 482, S. P. If there be any objection to the rule thus expressed, we think it lies in the qualification ; for it is equally out of our power to examine and say when there was gross abuse, or when an abuse of any other degree. If an alleged mistake of the court below be in the exercise of its discretion, we understand the rule to stand without exception, that no redress can be had by writ of error. The mistake is not the subject of a bill of exceptions. Suppose the decision to have been upon the mere order in which material evidence should be introduced ; or whether leading questions should be put on an examination in chief, because the witness appeared to be in feeling with the opposite party. How can a court of error undertake to direct in such matters ? The difficulty lies in a portion of the circumstances being intangible, and the danger of our being thus misled to consider that a very gross abuse which might have been in truth but a salutary restraint, or an equitable relaxation. In short, the whole subject is, like other matters of discretion, confided to the court of original jurisdiction, for the very sound reason, that they are in a situation to pass upon it, and we are not.

Mr. Cole was called and his testimony taken, in connection with the *examination* of Radliff, as signed and sworn to by him at the police office. The object was to show against the testimony of Mr. Wheaton and Mr. M'Kown, that he to whom they had imputed a contradiction between his oath, at the police office and the trial, was consistent. The examination was not received as conclusive, but barely competent. We are utterly at a loss to conceive any objection to its reception for such a purpose. It seems to have been the best imaginable resort of the prosecution. If, as the prisoner's counsel are understood to insist, the evidence altogether failed in its object, then, by weakening the pros-

ecution, it tended in favor of the prisoner. The examination was, we think, evidence *per se*, on its due execution and attestation being shown. Roscoe's Cr. Ev. 48, Phila. ed. 1836. It was material as tending to fix the limit of what Radliff did swear at the police office. And, for that purpose, proved as it was here, even had Mr. Cole been a private person, it would have been receivable in connection with his testimony, as an original cotemporaneous memorandum. *Merrill* v. *The Ithaca & Oswego Rail-Road Co.*, 16 Wendell, 595 to 599.

Among the other three points in the cause, the first is, that the court below erred in rejecting evidence to sustain Gillespie's *character for truth*. In order to this, there is no doubt that the general character of the witness should first be impeached. *Dodd* v. *Norris*, 3 Campb. 519. This is usually done by calling witnesses who have known him, and who will take it upon them to say, that from their knowledge of his *general character*, they would not believe him under oath, or that they know his general character for *truth*, and from that would deem him unworthy of belief under oath. Roscoe's Cr. Ev. 135, 6, Philad. ed. 1836, and the cases there cited. *Gilchrist* v. *McKee*, 4 Watts, 380 Per Story, J. in *Gass* v. *Stimson*, 2 Sumn. 610. In *The People* v. *Mather*, 4 Wendell, 257, 8, Mr. Justice Marcy recognizes the more general question which has always prevailed in England as a proper one, and this is doubtless correct: though, in consequence of what was said in *Jackson, ex dem. Boyd*, v. *Lewis*, 13 Johns. R. 504, the question has, I believe, more generally been addressed directly to character for truth. Thompson, Ch. J. there said, " the inquiry should have been as to her character for truth and veracity ; at all events, this should have been the principal and first inquiry." The proposition is repeated by Savage, Ch. J. in *Bakeman* v. *Rose*, 14 Wendell, 110. The object of both questions is the same. It is to convince the jury that the witness is unworthy of belief, from an habitual disregard to the law of truth, as collected by his neighbors from general report and his general conduct. *Sharp* v. *Scoging*, Holt's N. P. R. 541. For this purpose, the more broad

question is allowed as comprehending character for truth though the narrower one is preferable as being more direct; and, in either case, the grade of credibility may be fixed in the mind of the impeaching witness, by his declaring whether the character, as known to him, is so very bad that in his opinion the person sustaining it is utterly unworthy of credit on oath. *Rex* v. *Bispham,* 4 Car. & Payne, 392. Per Oakley, J. in *Fulton Bank* v. *Benedict,* 1 Hall's N. Y. Super. Ct. R. 558, 9. *Sharp* v. *Scoging,* Holt's N. P. R. 541. Thus a collateral issue is raised upon character ; and on the trial of it, you can never inquire into particular facts. For this there are two reasons : first, it would be impossible for a witness to prepare for trying his particular conduct. " In this way," says Pratt, Ch. J. " the character of witnesses might be vilified, without their having any opportunity to be vindicated ; *Layer's case,* 6 Hargr. St. Tr. 298 ; 15 How. St. Tr. 285, S. C. ; and see Roscoe's Cr. Ev. Philad. ed. *1836, p. 136 ;* 14 Wendell, 111 ; and secondly, it would lead " to an indefinite number of issues. The character of each witness might be impeached by separate charges, and loaded with such a burthen of collateral proof, that the administration of justice would become impracticable." Savage, Ch. J. in *Bakeman* v. *Rose,* 14 Wendell, 110, 111, and the books there cited by him.

But general proof is not the only means by which the character of a witness may be impeached. In *Jackson, ex dem. Stephenson,* v. *Walker,* 4 Esp. R. 50, one of the subscribing witnesses to a will, imputing fraud to the other two in procuring the will, they being dead, witnesses were called to their good character, in order to repel the imputation. This case shows, at least, that a particular act properly in evidence, may be so immoral as to shake the general character. Otherwise, why receive general evidence to support it ? The particular fact being pertinent to the issue, and not intended in its main purpose to affect character, but rather to show a fraud destroying the will, the counsel for the people may be right in saying that such general evidence would not have been allowed had the witness been alive. In that case the devisee must have called the wit-

nesses themselves to speak to the matter. The question was much examined in *Rowe* v. *Reed*, 3 Moore & Payne, 4, 5 Bing. 435, S. C., where the like evidence was received : and all the judges placed it on the ground of its being secondary proof, receivable from necessity. And see *Goodwright ex dem. Farr.* v. *Hicks*, Norris' Peake, 12 ; Bull. N. P. 296, 7, S. C. In *Rowe* v. *Reed*, a deceased attorney who attested the will was accused by a witness on the trial with having surreptitiously caused a third name to be added to the attestation, after the death of the testator, there being but two before. Best, Ch. J., said it was an attack on his moral character, and more than that ; for a forgery was imputed ; and the persons interested had a right to defend his character. In the *Bishop of Durham* v. *Beaumont*, 1 Camp. 10, Lord Ellenborough said that if, in *Doe* v. *Walker*, the witnesses had been alive, they must have been personally adduced, when their character would have appeared on their cross-examination. Nor is it considered objectionable either as embarrassing the witness or raising a multitude of collateral issues, that his general character should be looked into by an examination of himself, in respect to his moral habits or moral offences. To avoid an issue, the inquiry being collateral, you must take the witness' answer, if favorable to himself, as conclusive against you. Roscoe's Civ. Ev. 97. But if he makes disclosures showing his moral turpitude, you may insist upon it as destroying his character, and therefore taking away his credit with the jury. For his own protection, he may decline answering as to any thing which would subject him to a penalty ; and where that is not so, some judges, though they have allowed the question to be put, have done as the court below did in this instance, left the witness to his choice whether he will answer. The authorities to this are well summed up in Roscoe's Cr. Ev. Phila. ed. of 1836, p. 133, 4, 5 ; but need not be here examined. I will only observe that the practice of compelling the answer where there is no penalty, seems to be gaining ground by the modern cases. In *Cundell* v. *Pratt*, Mood. & Malk. 108, a witness was asked whether she lived in a state of incestuous concubinage, the counsel

avowing that his object was to degrade her character. Best, Ch. J., said he should not overrule that or any other such question, merely because it went to degrade the witness' character. He would never do so, until ordered by the house of lords. That by adopting such a rule many an innocent man would unjustly suffer. But he excused the witness because the offence was more than a mere moral one; it would subject her to a penalty. It is material, however, to observe, that in whatever form the attack may be made, its operation and effect are the same. It shakes credit by impairing general character. Accordingly, says Mr. Roscoe, Cr. Ev. 139, Phil. ed. 1836, "the credit of a witness may be impeached either simply by questions put to him on cross-examination, or by calling other witnesses to impeach his credit. Questions with regard to particular facts tending to degrade the witness and affect his *character and credit* may be put to him on cross-examination, *even though irrelevant to the matter in issue but the* party putting them must be satisfied with the answers given by the witness; and cannot call witnesses to prove those answers false." So much we have looked into authority without deeming such a resort very necessary to prove that where a witness has blazoned his grossly immoral conduct before a public audience and a jury sitting to try his credit, his general character is impaired in the same sense it would have been by the more usual evidence. It follows that the same evidence in reply is proper in the one case as in the other. Such is the·rule laid down by 1 Starkie's Ev. 186, as drawn from *Rex* v. *Clark*, 2 Starkie's R. 241, and he adds on the authority of the case from Esp. R., which we have cited, "so if the character of·the attesting witness to a deed or will, be impeached on the ground of fraud, evidence of his general good character is admissible." It is said that *Rex* v. *Clark*, is an equivocal authority for the position to which it is applied by the writer, who was certainly criticised as too general by the case of *Russell* v. *Coffin*, 8 Pick. 143. That case, however, denies merely that such evidence is admissible as a reply in the particular case of the witness being impeached by *his own contrary statement.*

Parker, Ch. J. p. 154, says : " The position laid down by Starkie cannot be carried to the extent contended for. He probably meant only that where the questions put in the cross-examination and the answers did impeach his *general character*, the other party might rebut by proving a *good general character*. And so far we do not object to the principle." But with great deference, I ask, do not discrepancies of statement in themselves go to general character? They are not like a contradicting witness on the fact itself, nor do they bring the matter to a mere test of memory. How do they operate in common understanding? Either to evince a dangerous levity and versatility, or down right dishonesty in representing a matter of fact. In *The People* v. *Vane*, 12 Wendell, 81, 2, the late chief justice said, the only reason for giving such evidence, *is to discredit the witness and impeach his credibility*. He adds, " when evidence has been given to produce that effect, it may be rebutted by evidence which destroys that effect. It can make no difference in principle, whether the impeachment arise from evidence discrediting the witness, or from a cross-examination, or a direct examination." It is true that the particular sustaining evidence to which he was speaking, was *former consistent statements*. But that he was right in putting a *contrary statement* material to the issue, as of the nature of evidence to general character, is inferrible from the fact that respectable courts have allowed general impeaching evidence to be met by consistent statements in the particular matter. This was so in several cases which grew out of the Irish rebellion between 1790 and 1800, and especially in *Leary's case*, A. D. 1795, stated in Macnally's Ev. 378. The character of one Lawler, had been impeached both on cross-examination and by a witness who swore he did not deserve credit on oath ; and the fact that he had before told a witness the story precisely as he had sworn to it on the trial, was received in reply. The same evidence was received in answer to an impeachment of O'Brien's credit by his cross-examination in *Finney's case*, A D. 1798. Macnally, 379, 380. These cases, we admit, come with diminished force, as being of a political character,

and open to the imputation of influence from the excitement of the times. But other judges, entirely free from that influence, have laid down the same rule. Buchanan, J., delivering the opinion of the court of appeals in Maryland, in *Cook v. Curtis*, 6 Har. & John. 94, said: "Where the credibility of a witness is attacked by the opposite party, his prior declarations may be *given in evidence to show his consistency.*" If such declarations may be shown to *answer* a general attack upon the character, the converse would seem to follow, that good character may be received to answer an attack by contradictory statements; and what I consider a very respectable contribution in the scale of authority on this point, is the fact that Mr. Phillipps in the 7th edition of his Treatise on Ev., vol. 1, 306, 7, has added what was omitted in several of his former editions, the following short section: "In answer to the evidence of contradictory statements, and for the purpose of corroborating the testimony of the witness *whose veracity has been thus impeached, it seems* reasonable to be allowed to show, that he is a man of *the strictest integrity and of scrupulous regard to truth.*" In the case at bar, it is not denied that Gillespie had been guilty of deliberate falsehood, either in his statements previous to, or at the trial. And looking to the effect of such testimony as it was understood by this court in *The People* v. *Vane*, in various other cases, and by the ablest writers on evidence, I am inclined, notwithstanding the case of *Russell* v. *Coffin*, to think that the balance of authority allows the admission of general evidence in reply. The clause cited from Phillipps points out in so many words, the very proof now in question. It is marked in the margin by the author, "Evidence in support of character; and that, when connected with the text, reads "*character for integrity and truth.*" This is the identical evidence of which the prisoner at the bar was deprived by the court below.

Whether the cross-examination of Gillespie in other particulars resulted *per se* in a case proper for the same evidence, must depend on *Rex* v. *Clark* and its kindred authorities. The trial there was for an assault upon Mrs. Webb, with intent to commit a rape. On cross-examination

she admitted that she had been twice in the house of correction on charges for stealing, and had since been admitted into the *refuge for the destitute*, the superintendent of which was called and examined to prove her good conduct there. Gurney objected, as her *character* had not been impeached by evidence *aliunde*. Scarlett answered, that she had been examined to particular facts for the purpose of impeaching her character; and Holroyd, J. said that was the object of the cross-examination, and to show that she was not credible. He added, "I do not see why such evidence may not be let in for the purpose of removing *the impeachment of her character upon cross-examination*, as well as if it had arisen *aliunde*. The circumstances which are offered, are offered with a view to show that the witness is not so unworthy of credit as she might have been considered to be if these circumstances had not intervened." I state so much of the case to show that the impeaching testimony was considered both by the counsel and the judge as in effect going to the witness' character—as striking at her general credibility. The nature of the evidence in reply is indicated by that effect. If it go to the *bad* character for credit, it is properly met by the *good;* and if the case cited is to stand for law, and supposing, without at present saying, that Gillespie's credit had been impeached in the same way, then the evidence proposed and overruled in the court below was, although not alone adapted to the case, emphatically proper in the point of form. I do not forget that the counsel for the people sought in argument to distinguish *Rex* v. *Clarke* upon its words. It was said to have allowed general good conduct, not *character*, in reply. But we regard the distinction as merely verbal. Proving good *conduct* is only another mode of giving good *character* in evidence. It is but the premises instead of the conclusion, according to what Gibbs, Ch. J. said in *Sharp* v. *Scoging*, Holt's N. P. Cas. 541, "General character is the result of general conduct, and every witness who presents himself in a court of justice undertakes for that." We have already seen sufficiently that counsel misconceive the reason for the cases going against an inquiry to facts. It is not because

they do not impeach character, but because the inquiry in a particular form might unjustly ruin the character of any witness past redemption. The evil is held not to exist when his own account is appealed to, and received as conclusive if in his favor. When the law compels him, or he volunteers to work the degradation of his own character, he stands entitled to the same form of reply as if he had been assailed by general evidence.

Then was Gillespie's character impeached within the rule ? Laying out of view that he was contradicted by Radliff and Whitney as to the fact of the prisoner withdrawing without raising the door bar a second time, and before he had reached the side-walk ; for I allow that mere contradiction upon particular facts does not raise a case for character, *Bishop of Durham* v. *Beaumont,* 1 Campb. 207, was his moral character impeached by his own account of himself? He had for some time led an idle and intemperate life, the *inmate of porter houses* at hours unseasonably late. He had for two years been wasting his means in a course of adulterous lewdness, alienated from his family, unjust to them and to his creditors. Contrast a man embarked in such vicious courses, not yet shown to be attended by one redeeming virtue, with any reputable citizen, on a contradiction of fact before a jury, could they hesitate between the two characters ? Yet these vices and more may abound in a character distinguished for an unyielding attachment to truth. *Prima facie* it is not so ; but the contrary is so common, that some judges have inclined to adopt the general impeaching question to character for veracity alone, *Gilchrist* v. *McKee,* 4 Watts, 380 ; while others who allow the broad English impeaching question as eminently proper, yet receive character for veracity in reply. *Noel* v. *Dickey,* 3 Bibb, 268. In the case last cited, the plaintiff had called two witnesses to make out his case, and who did make it out, if they were to be credited. The defendant, in order to discredit them, introduced a witness who swore that their *general character* was bad, (a form of impeachment allowed by the cases in Kentucky.) *Blue* v. *Kibby,* 1 Monroe, 195. *Hume* v. *Scott,* 3 A. K. Marsh. 260. The plaintiff then ask-

ed their character *in point of veracity;* but the court be-
low being of opinion that *general character* was the only
admissible inquiry, forbade the witness to answer the ques-
tion.   The arguments by which both modes of inquiry were
sustained, are so entirely pertinent to the question in hand,
that they ought not to be dismissed with a general refer-
ence.   *Hume* v. *Scott* overruled *Mobly* v. *Hamit,* a previ-
ous case in 1 A. K. Marsh. 591, which had restricted the
impeaching inquiry to character for veracity.    That case
had been followed, and came under review in *Hume* v.
*Scott,* where the rule was enlarged.    Mills, J. delivered the
opinion of the court.   He said " That a party litigant has a
right to impeach the witness of his adversary, by proving
his character bad, is a principle recited in every treatise of
evidence, and is disputed by no lawyer; but whether the
inquiry shall be confined exclusively to the general charac-
ter of the witness *for veracity* or falsehood, or may be ex-
tended to the *general moral character,* is a question on
which authorities shed far less light than might be expected.
We have therefore had to appeal to reason as the surest
guide to direct us on this point.   Every person conversant
with human nature, must be sensible of the kindred nature
of the vices to which it is addicted.   So true is this, that to
ascertain the existence of one vice of a particular charac-
ter, is frequently to prove the existence of more at the same
time in the same individual.    Add to this, that persons of
infamous character may and do frequently exist, who have
formed no character as to their lack of truth ; and society
may have never had the opportunity of ascertaining that
they are false in their words or oaths ; at the same time
they may be so notoriously guilty of acting falsehood, in
frauds, forgeries and other crimes, as would leave no doubt
of their being capable of speaking and swearing it, especial-
ly as they may frequently depose falsehood with greater
security against detection than practice those other vices.
In such cases, and with such characters, ought the jury to
be precluded from drawing inferences unfavorable to their
truth as witnesses, by excluding their general turpitude ?
By the character of every individual, that is, by the estima-

UTICA,
July, 1838.

The People
v.
Rector.

tion in which he is held in the society or neighborhood where he is conversant, his word and his oath is estimated. If that is free from imputation, his testimony weighs well. If it is sullied, in the same proportion his word will be doubted. We conceive it perfectly safe, and most conducive to the purposes of justice, to trust the jury with a full knowledge of the standing of a witness into whose character an inquiry is made. It will not thence follow, that from minor vices, they will draw the conclusion in every instance that his oath must be discredited, but only be put on their guard to scrutinize his statements more strictly, while in cases of vile reputation in other respects, they would be warranted in disbelieving him, though he had never been called so often to the book as to fix upon him the reputation of a liar when on oath." In *Noel* v. *Dickey*, it will be remembered that the witnesses having been impeached within the rule thus vindicated, it was sought to be answered that though their characters were *generally bad*, yet this was not so *in respect to veracity*; and Boyle, Ch. J. delivered the opinion of the court. He said, "We can see nothing in the inquiry proposed by the plaintiff, and interdicted by the court, which was impertinent or improper. On the contrary, it appears to be better calculated than any more general inquiry can be to elicit the truth, and enable the jury correctly to estimate the credit due to the witnesses whose characters were assailed. It is an observation not less true than trite, that no one is entirely virtuous or entirely vicious. Such indeed is in general the preponderance of the virtue or vice of individuals, as to entitle them to the general character of good or bad; but we cannot merely from knowing what the general character is, say with certainty what vice or virtue enters into its composition. If, therefore, we would form a correct judgment of a man in regard to any particular vice or virtue, it is necessary that we should be informed of his character in that particular respect. This is more especially necessary as it regards a man of bad character for frequently a single vicious habit, and sometimes even a solitary vicious action is sufficient in the common estimation of mankind, to give to a person a general

bad character. A person, therefore, whose general char- <span></span>acter is bad, may notwithstanding possess such a degree of veracity, as to entitle him to credit on oath ; and whether he does so or not, can only be ascertained by an inquiry into his character for truth." *Gilchrist* v. *McKee*, 4 Watts, 381, S. P. discussed by Gibson, C. J.

UTICA, July, 1838.

The People v. Rector.

This elemental examination, by the court of appeals of Kentucky, if correct in its result, disposes of the whole question as to the evidence offered by way of sustaining Gillespie's character. We thus see, that the principle upon which it was offered, accords entirely with the authorities to which we have had occasion to refer ; and it follows, as I think, that the court below erred in rejecting the evidence ; unless, as was insisted by the counsel for the people, they had before done what was equivalent, through the testimony of Tallman. He was called to give general evidence against Gillespie. He knew him well ; but answered that he knew nothing against his general character for truth. This failure is said to be equal to all the best sustaining witnesses who could have been brought. The great impropriety of our attempting such an estimate of quantities upon a bill of exceptions is sufficiently obvious. An unqualified admission of perfectly good character, might have been an answer ; but no such admission was made. The case remained still entirely open for asking the jury to infer that the man's sense of all obligation to speak truth, was almost as slender as the tie which bound him to the virtue of continency.

The second point made by the prisoner's counsel is, that the court should have received proof of the riotous breaking of the prisoner's house the previous Saturday night ; that the inmates had then been badly abused, and that the rioters threatened to return another night soon after, and break in if they were not admitted. This was offered to establish a reasonable ground for the prisoner's apprehending the execution of a similar threat now repeated and attempted, according to some of the evidence, with great violence, and even persevered in after notice to depart. No doubt the deceased and his companions became trespassers by then

remaining and pressing to be admitted. Wilson, who was intoxicated, had departed a short distance; but the deceased and Whitney remained on the walk in front of the house, without having taken any means to allay the alarm in the prisoner's mind, which the jury might have thought had been probably excited. Appearances were equivocal upon the point of design. Wilson had apparently left the place, but this, by the prisoner, might have been read as an errand of assistance to those who remained. Here was a juncture of circumstances which the jury might have thought sufficient ground for real alarm, and an effort for protection by actual violence and a disabling of the assailants. That they had come to a house of ill fame, accustomed to receive and entertain rioters, might have been an answering argument. It was not for the prisoner to invite guests to his house in the dead hour of night, and then, under affected apprehension, bully them out of their lives. But standing, as he did, already obnoxious to the indignation of the better part of community, it was a fair inquiry of the jury, would he deepen public execration, without a real cause, by the shedding of human blood? It did not appear that he knew the deceased and his companions, so as to distinguish them from the previous rioters. The names of these were not put forward in the proposition of the prisoner's counsel; nor perhaps could they be. The proposition was not therefore objectionable as being intentionally too short in that respect. I do not understand it to be objected, that real alarm on the part of the prisoner, on apparent though unreal grounds, was not pertinent to the issue. The argument is rather, that the character of the prisoner's house and employment were such that the court might, *in limine*, say, upon such full evidence, that apprehension of danger was a mere pretence. In *Meade's case*, Lewin's Cr. Cas. 184, and which is recited at large in Roscoe's Cr. Ev. 644, 645, Phila. ed. 1836, a like previous threat from the very persons who came, although they made no attack, was submitted by Holroyd, J. to the jury, to consider whether it did not furnish a reasonable ground for apprehending an attack. There the death was occasioned by firing a loaded

pistol. The case at bar presents the same circumstance of alarm one step more remote, the assailants not being identified with the previous rioters. That, *per se*, however would not so absolutely remove apprehension that the killing could not be referred to it. The jury might have laid no stress upon the circumstance ; but I think it should have been received, because we cannot say they would not. The lightness of a relevant circumstance is no argument for withholding it from the jury. *Rex* v. *Northampton*, 2 Maule & Selw. 262. In the prosecution of a crime so essentially the creature of intent, as murder, every thing pertinent should be submitted to the jury upon which they may infer an absence of malice. The instrument, as used in this case, proved to be most dangerous, but it was not deadly in its own character ; and, connected with the prisoner's manner as described by Gillespie, could the jury have been brought to believe him, the whole might have presented fair matter of argument, on the question whether the resistance offered was out of proportion to the injury which there was reasonable cause for apprehending. Evidence that the killing was for such a cause, if it would not make out a justifiable or excusable homicide, 2 R. S. 660, § 3, 4, would have brought down the crime to the lowest degree of manslaughter, id. 662, § 19, and see Roscoe's Cr. Ev. 643, Philad. ed. 1836. It may be proper to observe that, after the prisoner had given notice to the deceased and his companions to depart, his house was, in respect to them, a mere private one ; and, in the eyes of the law, entitled to the same measure of protection as the house in *Meade's case*. Any farther assault, therefore, or any apprehended assault, might be repelled, upon the same principles as in that case.

The fifth point complains of the refusal to charge that, if the mortal wound was given in an attempt to commit an offence less than felony, the prisoner should not have been convicted of murder. The reason assigned for the refusal is, that such a charge could have had no application to the case as made out in evidence. This again depended upon what the jury might say after turning the whole matter over in their minds. Looking at the instrument used, the testi-

mony of Gillespie that there was only one blow, and the obvious and admitted conclusion that this blow was not fatal ; we have a case on which the jury need not have strained a point to say that the immediate offence was a misdemeanor only. Neither the bar, nor the manner of using it, would necessarily or probably have resulted in death. It would have knocked the deceased down and might have produced death in consequence of the head striking the walk. It is no answer to say here that the balance of proof showed a second and fatal blow with this club. Was the proof so overwhelming that as matter of law the jury must have dismissed all thought of the contrary ? So far from this, there was, on the part of the prosecutiom, no direct proof of a second blow while Gillespie positively swore there was no second blow given. Surely his testimony was yet before the jury for better or for worse, though the sustaining evidence had been excluded. The point of degree in the homicide was thus erroneously withdrawn ; for we take the statute to be clear, both in its words and in the construction it has received, that a homicide occasioned by a misdemeanor or an attempt to commit one, though murder at the common law, is now but manslaughter in the first degree. 2 R. S. 661, § 6, in connection with id. 657, § 5, sub. 3. *The People* v. *Enoch*, 13 Wendell, 163, 174, 176.

The object of the statute was to save one sort of constructive murder, and abolish another. By the 5th sec. p. 657, if a man be engaged with an immediate view to one felony, as a burglary, and death ensue, it is murder. But if his immediate object be a crime less than felony, as a riot, the death is but manslaughter in the first degree. The latter is the case provided for in the 6th sec. p. 550, sub. 1, 2 ; and so it was understood in *The People* v. *Enoch*, though I admit the point was not decided there. The only way to avoid such a construction, is by saying that the blow cannot be a misdemeanor when it results in death, because the act is then a felony, to wit, manslaughter, *ergo* it is murder. The section is open to such a reading in the light of a severe criticism ; but it is such a criticism as must work a repeal of the section itself. It supposes that there can be no such

thing as a misdemeanor where death ensues, because the misdemeanor is merged in the consequence. The only construction it appears to me, which will warrant this refusal to charge, and yet leave any thing for the statute to operate upon, is that which shall confine it to a blow not intentionally aimed at the person of the deceased : as where one, in entering a house riotously, breaks the door, and by the same blow kills a man who is holding it on the opposite side, the assailant being ignorant of that fact. The section contains no such restriction in terms. It says that it shall be but manslaughter when the offender is engaged : 1. in the perpetration of a crime not amounting to felony, or 2. in an *attempt* to perpetrate any such crime or misdemeanor, 2 R. S. 550, sec. 6, sub. 1, 2 ; either case being such wherein the killing would have been murder at the common law. I understand these words as meaning to reduce the offence to manslaughter in the first degree, in all cases where the jury shall find that the assailant intended to stop with the commission of a misdemeanor, though the blow were aimed at the person. A mere blow with the fist may produce death ; yet hardly any jury would affix the intent of such a consequence. A man in opposing himself to an invasion of his premises, or what he honestly believes to be an attempt to invade them, rashly runs into an excess of protective resistance ; he strikes with a stick, a cane, a door bar, or whatever comes handiest, not such an instrument as necessarily leads the mind to infer a fatal intent, and death ensues from some collateral circumstance, as the head striking a hard substance, or a concussion of the brain in the fall ; this seems to me to be within the statute, and if the whole evidence before us would have warranted the prisoner's counsel in contending that such was the case below, then it was too strong to say that the hypothesis proposed to be submitted to the jury was inapplicable.

If it be said that death from such resistance, being merely accidental, would not have been murder at the common law, and is therefore not within the section cited, then I answer that this only magnifies the error. The statute no where makes it murder ; and it would be left to fall down to some homicide inferior to manslaughter in the first degree.

UTICA, July, 1838.

The People v. Rector.

UTICA,
July, 1838.

The People
v.
Rector.

The proposition made was intended to leave an opening for reducing the offence below the degree of murder, and denying that it was *at all applicable*, was the more widely erroneous in proportion as the case supposed, stood lower on the scale of homicide.

It is not to be denied that, taking the proposition and the response of the court below literally, the exception may properly be overruled in another point of view. The charge proposed by counsel was that if the prisoner made but *an attempt* to commit a crime less than felony, the death would be only manslaughter. This the judge said, and said truly, was inapplicable. There was no *mere attempt* to commit a misdemeanor in the case; and no pretence of it. If there was any thing short of a felony, it was an actual misdemeanor, an actual assault and battery, and it should have been put forward under that branch of the clause in the statute which speaks of actual commission. Such a distinction has, however, occurred to no one in the whole course of the discussion to which this case has given rise. It has been conceded from the beginning to the end that the proposition should be viewed as having the same force as if it had been put in the alternative words of the statute : the *actual commission, or an attempt* to commit a crime less than felony. Indeed, I hardly understood the counsel for the people as denying that if the case was open for insisting that the prisoner intended merely to commit an assault and battery, such an intent would mitigate the crime to manslaughter in the first degree, and I can not consent that a case of life and death should go off on a verbal criticism, with which it is apparent no one ever intended it should be embarrassed.

On the whole I do not deny that a wanton excess in the use of a deadly instrument, or other circumstances of great ferocity or brutality, would warrant a judge in refusing to charge as requested on the ground stated, and in the case below, an answer might certainly arise from the imminently dangerous character of the act, to the evidence of which it would have been right for the judge to direct the attention of the jury. But I do not see any such decisive balance

against the hypothesis proposed by counsel, as authorized him absolutely to withdraw the attention of the jury from it. There was evidence tending to establish an intent to stop with the commission of a severe assault and battery. The judge might have shown to the jury that such evidence was slight, or for what reason it should be discredited; but could not withhold the submission of the point altogether. *Cole* v. *Hebb*, 7 Gill & John. 20, 26, *et seq.* I am, therefore, of opinion that there should be a new trial.

By BRONSON, J. There are several ways of impeaching the credit of a witness. The party against whom the witness is called may disprove the facts stated by him, or may examine other witnesses as to his general character for truth. In answer to evidence against character, the other party may cross-examine the witnesses as to their means of knowledge, may attack their general character, or by fresh evidence support the character of his own witness. The credit of a witness may be shaken, and perhaps entirely destroyed by his own cross-examination, or by disproving the fact to which he has deposed. But in neither of these cases can the witness be supported by proving his general good character as a man of truth. With only one or two exceptions at most, and those resting on special considerations not applicable to this case, such evidence is only admissible in answer to evidence of *general character*, first given by the other party.

In *The Bishop of Durham* v. *Beaumont*, 1 Camp. 207, Lord Ellenborough refused to admit evidence in support of the character of a witness who stood contradicted by another witness. In *Russell* v. *Coffin*, 8 Pick. 143, the deposition of the witness taken out of court was introduced for the purpose of contradicting his testimony on the stand; and yet the party who called him was not allowed to go into evidence of his general character. Parker, C. J. said, it never was decided, that if a witness was contradicted as to any fact of his testimony, either by his own declarations at other times, or by other witnesses, evidence might be admitted to prove his general good character. If this were

UTICA,
July, 1838.

The People
v.
Rector.

the practice, he adds, great delay and confusion would arise, and as almost *all cases are tried* upon controverted testimony, each witness must bring his compurgators to support him when he is contradicted, and indeed, it would be a trial of the witnesses and not of the action. In both of these cases the credit of the witness was impeached : in the first, he was contradicted by another witness, and in the second, he had given different accounts on oath of the same transaction. If under such circumstances the witness could not be supported by evidence of good character, I am at a loss to discover upon what principle such evidence could be received in the case at bar. It is said that the moral character of Gillespie was impeached by the evidence which he voluntarily gave concerning his course of life. That is true : and it is equally true that the moral character of the witness who gave different relations on oath of the same transaction was impeached. Yet evidence to support him was rejected.

I have met with no adjudged case which sanctions more than two exceptions to the rule, that a party can only give evidence in support of the character of his own witness, in answer to evidence of general character coming from the other side. Indeed, where the witness has been produced and examined on the trial, there is only one exception to the rule, and that does not touch the case at bar.

In *Doe* v. *Stephenson*, 3 Esp. R. 248, the validity of a will was contested on the ground of fraud in procuring it. Two of the subscribing witnesses, being the attorney who prepared the will, and his clerk, were dead, and the third witness on being called testified to facts, impeaching the conduct of the deceased witnesses. Lord Eldon allowed the defendant, who claimed under the will, to prove that the deceased witnesses were persons of character, and not likely to procure such a will as was imputed to have been imposed on the testatrix. The same will was again before the court, in *Doe* v. *Walker*, 4 Esp. R. 50, and Lord Kenyon admitted evidence of the good character of the deceased witnesses. Cases relating to the execution of wills, are in some respects governed by peculiar principles. But

it is only necessary to notice one feature in this case, to distinguish it from the one at bar. The attesting witnesses were dead, and could not speak for themselves. When Lord Ellenborough rejected evidence of general character, to support a contradicted witness, 1 Camp. 207, he said of the case of *Doe* v. *Walker*, "there the attesting witnesses whose character was disputed were dead, and it was properly held that the party claiming under the will, should have the same advantage as if they had been alive. In that case they must have been personally adduced as witnesses, when their characters would have appeared on their cross-examination, and being dead, justice required that an opportunity should be given to show what credit was to be attached to their attestation of the will." In *Provis* v. *Reed*, 3 Moore, & P. 4, the case of *Doe* v. *Walker*, was sanctioned by the court of common pleas. Best, C. J., takes a distinction between the attesting witness to a *will*, and a witness to a bill of exchange, bond or other security of a like nature. "Instruments of that description," he says, "are generally of recent date, and given within the time of living witnesses," whilst wills frequently remain undisputed until long after the death of all the parties who attested their execution. In the present case the testator died in 1802, and the tenant has been in possession ever since. If, after the lapse of twenty-seven years, the character of a *deceased* subscribing witness be attacked, evidence of his good character may and ought to be received in order to repel such attack." It will be seen that these cases, on which the prisoner's counsel seemed mainly to rely, do not controvert the general rule which has been mentioned. They stand on peculiar ground, applicable only to the case of an attesting witness who is dead : and even then, it seems that the evidence is not admissible except in relation to wills. In the recent case of *Doe* v. *Harris*, 7 Car. & Pay. 330, the solicitor who drew the will was sworn as a witness for the defendant, and having been attacked on the cross-examination, the defendant proposed to call witnesses to his good character; but Coleridge, J. overruled the evidence, holding that it was only admissible where the solicitor was dead.

UTICA,
July, 1838.

The People
v.
Rector.

The marginal note to the case of *the Bishop of Durham* v. *Beaumont,* 1 Camp. 207, which has found its way into several elementary books, is not warranted by the case itself. The note is, that "evidence to support the character of a witness is not admissible, *unless fraud is expressly imputed to him.*" There is nothing in the opinion of Lord Ellenborough, to warrant the inference that he would have received evidence of general character, if fraud had been expressly imputed to the witness. He merely decided that *the contradiction* of the witness furnished no ground for giving evidence to sustain his general character.

When the witness has been produced and examined on the trial, the only exception to the general rule which has been mentioned, will be found in the case of *Rex* v. *Clark,* 2 Stark. R. 241. There the witness on cross-examination admitted that she had *several years before* been sent to the house of correction, on charges of having stolen money from her master. *Holroyd J.* admitted evidence to show that the conduct of the witness had been good *since that time.* Whether this single *nisi prius* decision should be followed or not, is a question which need not now be considered. The distinction between that case and the one at bar, is· apparent. There, the witness had admitted the commission of a crime years before, and the question was whether her character had not since been reformed; but here, the grossly immoral conduct of the witness, Gillespie, had continued for two years, and quite down to tne time of the trial. There was no space in which, by good conduct, he could have established a better character.

Mr. Starkie says, "if the character of a witness has been impeached, although upon cross-examination only, evidence on the other side may be given to support the character of the witness, by general evidence of good conduct." 1 Stark. Ev. 148. When he again adverts to this subject, he speaks with greater caution. His language is, that "in all cases where the credit of a witness has been attacked, whether by general evidence, or by particular questions put upon cross-examination, *it seems* that the party who called him is at liberty to support his testimony by general evi-

dence of good character." 2 id. 1757. The terms in which the rule is stated would be calculated to mislead, if he had not in both instances referred to the single case of *Rex* v. *Clark* as his authority. How far that case goes we have already seen. One or two other elementary writers on the law of evidence have considered *Rex* v. *Clark* as an authority for admitting evidence to sustain the character of a witness attacked on the cross-examination ; and Mr. Phillipps in the seventh edition of his valuable treatise is among the number. But it is worthy of remark, that this doctrine did not find its way into the previous editions of his work, and that no trace of it is to be found in the books previous to the case which has been mentioned. It is evidently a new rule in the law of evidence, and I deem it far more safe to abide by the ancient landmarks of the law, than to follow a strained commentary upon a single decision made in the haste of a trial at *nisi prius*.

The case of *The People* v. *Vane*, 12 Wendell, 78, proves nothing on the question under consideration. The case at bar is much like that of *Dodd* v. *Norris*, 3 Camp. 519, which was an action for seducing the plaintiff's daughter. She was a witness, and was cross-examined at considerable length to show that she had submitted herself to the defendant's embraces under circumstances of extreme indelicacy, and had been guilty of great levity of conduct. On this ground, Garrow for the plaintiff proposed to call witnesses to the character of the daughter. But Lord Ellenborough ruled, " that he was not at liberty to do so, as no evidence of her bad character had been given on the part of the defendant. The questions put to herself on cross-examination there was an ample opportunity of explaining as far as the truth would permit, when she came to be re-examined." We have here an express adjudication, that evidence is not admissible to support a witness whose character has been impeached by the cross-examination only. It is said that the character of the daughter was a fact in issue. But the case was not put upon that ground by the judge. He held that the plaintiff could not go into general evidence to sustain the character of his witness, for the reason that " no evidence

of her bad character had been given on the part of the defendant."

*Doe* v. *Harris*, 7 Car. & Pay. 330, is another express adjudication against receiving evidence to sustain a witness who had been attacked on the cross-examination. This case was decided in 1836, and it proves most satisfactorily that the overdrawn commentaries of Starkie and Phillipps upon the case of *Rex* v. *Clark* are not regarded as law at Westminster Hall. In this state, such evidence has never been held admissible. There is not only the want of any adjudged case to that effect, but in my limited experience I have never known or heard of the admission of such evidence at the circuit.

Why should such evidence be received, when the witness is on the stand to give any explanation of his conduct which the truth of the case will permit? Gillespie was not obliged to proclaim his own infamy. He did it voluntarily after having been informed by the court that he could not be required to speak. But aside from this consideration, if there was any thing to extenuate his conduct in abandoning his family and living in adultery, he was at liberty to state it. He stood there to make a picture of himself, and it is not to be presumed that he would draw it in darker colors than the truth of the case absolutely required. Neither the party who produces a witness nor the witness himself, has any right to complain. that compurgators are not allowed, when there has been no impeachment beyond the facts disclosed by the witness himself.

Upon what ground is it that the parties in an inquiry after truth concerning a particular transaction, are permitted to get up a collateral issue on the character of a witness? It surely cannot be on the ground that the witness proves himself unworthy of credit. These collateral issues have always been regarded as an evil, and they are only permitted for the reason that the witness may apparently be entitled to credit, when in truth his character is such as to render him unworthy of belief. The party against whom he is called is therefore allowed to give evidence of his gen-

eral character to the jury; and when thus assailed the witness may be sustained by general evidence in reply.

UTICA,
July, 1838.

The People
v.
Rector.

Where shall we stop if we depart from this rule? The credit of a witness may not only be shaken but utterly overthrown by disproving the facts to which he testifies. If evidence of general character is not admissible where the witness has only been contradicted by others, may it be given where he contradicts himself by conflicting statements either in or out of court? Or if the rule to be established is, that the witness may be supported whenever his moral character is assailed, how shall it be determined what amounts to an impeachment of moral character? Disproving the facts to which a witness speaks may amount to such an impeachment; and so too of contradictory statements whether made in or out of court. Both the credit and character of a witness may be affected by a doubtful, hesitating or apparently disingenuous manner in giving his evidence. The jury may draw unfavorable conclusions against the credit of a witness upon appearances which can never be communicated to those who are not present at the time. Shall a party whenever he thinks the credit of his witness impaired, be allowed to give evidence of his general character for truth? It is apparent that such a course will multiply collateral issues to an indefinite extent, and however plausible may be the argument that such a course is calculated to advance the ends of justice, I cannot doubt that it will have the contrary effect. The only plain and practical rule is that which allows a party to give evidence in support of the character of his witness, in answer to evidence of general character coming from the other side, and in that case only. This is, I think, the rule of the common law, and could a better one be devised, I should not feel myself at liberty to follow it.

The next exception, in the order in which they were presented by the prisoner's counsel, is that which relates to the rejection of evidence to prove a riot in the prisoner's house a week before the deceased received the fatal wound. It is important here to notice with accuracy what facts the prisoner proposed to prove, and the purpose for which the

evidence was offered. The bill of exceptions states that an offer was made in the course of the trial, to prove "that the house of the prisoner had been attacked on the Saturday night previous to the transaction in question by several persons, and broken into, and the imates very badly abused, and that they then threatened to return some other night soon after and break in again if they were not admitted." This was the offer : the purpose for which it was made, as stated in the bill of exceptions, was, "to show that the prisoner had reason to apprehend violence upon his house at the time that the deceased and his companions came there, and that was his reason for using so much force as he did." We are referred on this point to *Meade's case*, Lewin, C. C. 184, as cited in Roscoe Cr. Ev. 645. There are some very important points of difference between that case and the one at bar. In that case the boatmen, of whom Law, the deceased, seems to have been one, attacked Meade, ducked him, and were in the act of throwing him into the sea, when he was rescued by the police. As Meade was going away the boatmen threatened him that they would come at night and pull his house down. In the middle of the night Law and a great number of persons came about Meade's house, singing songs of menace and using violent language. Meade, under an apprehension as he alleged that his life and property were in danger, fired a pistol, by which Law one of the party was killed. Belt was also indicted with Meade, as having been present aiding and abetting the alleged murder. Holroyd, J., among other things, said to the jury, "if you are of opinion that the prisoners were *really attacked*, and that Law and his party were *on the point of breaking in, or likely to do so, and execute the threat of the day before*, they were *perhaps* justified in firing as they did." In the case at bar the pretended attack was not made the very next night after the threat of the rioters ; a whole week had intervened. The attack was not made by a great number of persons ; there were only three young men, and the knocking or kicking at the door for admittance was probably nothing more than the prisoner had been accustomed to hear with-

out any apprehension for the safety of his person or property.

But what is very material, there was no offer to prove that either of the three young men was of the party which had committed the riot, or had any connection or acquaintance whatever with the rioters. Nor was there any offer to show that the prisoner supposed or believed, or had any reason to suspect or believe, that either of these three men had any thing to do with the previous disturbance, or the threatened assault on his house. There was no suggestion that either the rioters or the young men were strangers to the prisoner. So far as the offer goes, he may have known very well that the deceased and his companions had nothing to do with the previous disturbance. Surely there is nothing in *Meade's case* to warrant the admission of such evidence, as the prisoner proposed to give.

It is not improbable that the prisoner knew the persons who had broken into his house, and abused the inmates a week before, especially as the case states that rioters had been admitted *as guests* in his house. But if he did not know their names, he might be very well able to distinguish between them and the three young men. It was "a clear moonlight night, very light," when the deceased and his companions went to the house. The prisoner came to the window and held a conversation with them before he made the attack, in which there was no intimation that he regarded them as rioters, or that they had ever done any act to excite his apprehension. But aside from the probability that the prisoner knew the deceased and his companions had nothing to do with the previous assault, the offer did not go far enough to show any connection between the two transactions. Had the evidence been received, it would have furnished no just ground for the inference that the previous riot was at all in the mind of the prisoner at the time he made the attack. It was a mere after-thought—an attempt to get up and distract the minds of the jury with a collateral question, utterly foreign to the point in issue.

The bill of exceptions states the purpose for which the evidence was offered. It was, " to show that the prisoner

had reason to apprehend violence upon his house at the time the deceased and his companions came there, and that that was his reason for using so much force as he did." Here we have the inference which the prisoner wishes to draw from the evidence ; and it is worthy of notice that he does not pretend that the evidence would warrant any inference that violence upon his house was to be apprehended from the deceased and his companions. He only contends that he had reason to expect violence at that time, but does not venture the suggestion that it was to come from the deceased or his fellows. What then do this offer and the inference from it come to ? The prisoner says, rioters broke into my house a week before, abused the inmates, and threatened another attack ; therefore I had reason to apprehend violence upon my house at the time the young men came there—not that I had any reason to expect violence from them, but from the rioters; this is my reason for sallying out of the house and attacking the deceased with a dangerous weapon. It seems impossible to maintain that the evidence was admissible. The facts, if proved, would not furnish even a colorable pretence for the attack on the deceased. Although it is never necessary that the evidence offered should be conclusive, it is always essential that it should have a direct tendency to establish the point in controversy. A different rule would lead to the most mischievous consequences in trial by jury.

Another exception taken on the trial was to the refusal of the court below to give a particular instruction to the jury. The case states that the prisoner's counsel called on the court to charge the jury, " that if they came to the conclusion that the prisoner inflicted the mortal wound upon the deceased in an attempt to commit an offence which of itself was less than a felony, then he should not be convicted of murder." The circuit judge refused to give the instruction, saying " it was inapplicable to this case." It is then immediately added, that " the circuit judge had previously in his charge to the jury stated the specific language of the revised statutes which defines the crimes of murder and of manslaughter in their several degrees." The request obvi-

ously assumes that the prisoner was not acting in necessary self defence, nor in defence of his dwelling, but that he was engaged in an attempt to commit an offence of some kind. The killing therefore could be neither justifiable nor excusable homicide, but must be manslaughter at the least. If the prisoner intended to kill the deceased, it was then clearly murder ; for there cannot, I think, be more than two cases where the killing will be less than murder, if the commission of an offence of any kind was coupled with an intent to take the life of the person killed. The two exceptions relate to the killing of an unborn quick child. 2 R. S. 661, § 8, 9. If there can be any doubt of the soundness of this position, the killing would, beyond all question, be manslaughter, and manslaughter, whatever may be its degree, is now a felony. 2 R. S. 662, § 20, 21 ; p. 702, § 30.

There is no pretence that the prisoner, while engaged in a riot or other misdemeanor not amounting to felony, killed the deceased by misadventure. He was engaged in no other offence than that of illegally beating the deceased. That was what he intended to do ; and whether he designed to kill or not, I think the judge was right in holding that the desired instruction was " inapplicable to this case." Such a charge could only be proper where the accused was committing or attempting to commit some other offence than that of intentional violence upon the person killed.

I shall only refer to the evidence for the purpose of showing that the question of murder was fairly in the case. When the prisoner told Shepherd and his fellows that they could not come in, Wilson, who was somewhat intoxicated, uttered something like a threat that he would come in ; but immediately walked away down the street about fifteen or twenty feet to obey a call of nature. While he was there, the deceased and Whitney left the stoop and stood upon the side walk. There was no proof of any further knocking, nor any renewed manifestation of an intent to enter the house. At this time the prisoner, who had witnessed every thing by the bright moon light, left the window at which he had been standing and went to the door. After stopping

there for about half a minute, he opened the door and went out with the door bar raised over his shoulder in both his hands, and, while Shepherd and Whitney stood defenceless and unoffending, struck the deceased on the head and knocked him down. The prisoner immediately raised the bar again in both his hands, and as the jury have found by their verdict, gave a second and the fatal blow on the back part of the head. That this killing was either murder or manslaughter no one can deny; and if the jury were right in finding the second blow, it is very difficult to escape the conclusion that the prisoner was guilty of the more aggravated offence.

That one who kills another by an unlawful beating may be guilty of murder, although there was no intent to kill, is a proposition almost too plain for discussion. Whether it be murder or only manslaughter must depend on the attending circumstances : such as the violence of the attack and the weapon with which it was made. In this instance the prisoner used a dangerous weapon, and from the nature of the instrument and the violence of the assault, it was not improbable that death would be the consequence. If there can be any doubt on this point, it was a question of fact for the decision of the jury, and one which we cannot review. If a man assault another with intent to do him a bodily injury, and death ensue, malice sufficient to constitute murder will be presumed, if the act be of such a nature as plainly and in the ordinary course of events must put the life of the party in jeopardy. This doctrine will be found in every book which treats of the crime of homicide, and it is now a part of our statute law, though expressed in different words. The killing is murder, "when perpetrated by an act imminently dangerous to others, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." 2 R. S. 657, § 5, sub. 2. We have already seen that the prisoner was engaged in no other act than that of unlawfully beating the deceased. What rule of law then did the counsel ask the court to lay down for the guidance of the jury ? It was in effect neither more nor less than this : if you believe

the prisoner was unlawfully beating the deceased without any intent to kill, then he should not be convicted of the crime of murder.  If the court had yielded to the request, and given this instruction to the jury, it would, I think, have erred beyond all question.  It would, in effect, have been telling the jury, that in case of a direct assault upon the person killed, however deliberately it may have been made, and without regard to the weapon employed or the violence of the attack, the crime can never be murder, unless the act was done with an intent to kill.  It is impossible to escape this conclusion.  Yet the statute expressly provides, that the killing shall be murder, not only where there was, but where there was not any intent to effect death, if the killing was perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life.

Where there is no intent to kill, the offence may be either murder or manslaughter ; the graduation of the crime depending on the manner in which it was committed and the other attending circumstances.  When the act is done in committing, or attempting to commit a misdemeanor below the grade of felony, and the deceased is killed by misadventure ; and when the killing is in a heat of passion, but in a cruel or unusual manner, or by a dangerous weapon, the crime may be only manslaughter : 2 R. S. 661, § 6, 10, 12 ; but when perpetrated by an act imminently dangerous to others, and evincing a depraved mind regardless of human life, it will be murder.  Id. p. 657, § 5.  It was for the jury to say, upon the evidence, whether the prisoner was guilty of the greater or the lesser offence, and the court was right in refusing to withdraw that question from their consideration.

There is no reason to suppose that the prisoner has suffered either by the misdirection of the court below, or by any omission to give the proper instruction to the jury on every question of law applicable to the case.  The circuit judge charged the jury in relation to the crime of murder and that of manslaughter in its several degrees as defined by the revised statutes ; and we must believe that the charge was free from objection, as the counsel has not thought proper to set it forth and except.

The prisoner's counsel rely on the sixth section of the article relating to manslaughter, which declares that the killing of a human being, without the design to effect death, while the accused is engaged "in the perpetration of any crime or misdemeanor not amounting to felony, or in an attempt to perpetrate any such crime or misdemeanor, in cases where such killing would be murder at the common law, shall be deemed manslaughter in the first degree." This section only applies to that class of cases where the accused, while engaged in committing some other crime or misdemeanor, kills a human being by accident or misadventure, and without any intent to do him a bodily injury. It has no application where an attack, either with or without an intent to kill, is made upon a particular individual. If death be the consequence of a wound intentionally inflicted, the offence may be either murder or manslaughter; but the degree of crime depends on other provisions in the law of homicide, and not on the section under consideration. We cannot give a more extended construction to this section without bringing it into necessary conflict with that which defines the crime of murder.

The construction which I have given to the statute is supported by the opinion of the chancellor in delivering the unanimous judgment of the court for the correction of errors in the case of *The People* v. *Enoch*, 13 Wendell, 176. The chancellor remarks, that some cases of unintentional killing, by persons engaged in riots and other misdemeanors below the grade of felony, had before the revisions been improperly considered as cases of murder; but that they are now restored to that grade of homicide to which they properly belong. He then adds, "all offences of that description are now placed in the class of homicides committed without malice aforethought; except where the killing is perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life; which circumstances now, as at the common law, are sufficient to authorize the jury to find the defendant guilty of killing with malice aforethought." If I do not misapprehend the meaning of the learned chancellor, he intends to say, that in cases of

unintentional killing by persons engaged in riots and other misdemeanors below the grade of felony, although the crime will, in general, only be manslaughter; yet under certain circumstances such killing may amount to the crime of murder. Although it is not necessary to go so far on the present occasion, I certainly am not prepared to question this doctrine. All that I intend now to say is, that where there is an intentional attack on a particular individual and death ensues, the crime of the assailant may be murder, although he did not intend to kill. If such be the law of the land, of which I cannot entertain a doubt, the court below was right in refusing to give the desired instruction to the jury.

The other three questions presented by the bill of exceptions were not much pressed on the argument. I only deem it necessary to say, that after examining each of those exceptions, I fully concur in the opinion expressed by my brother Cowen, that they furnish no ground for disturbing the verdict.

I have purposely abstained from a discussion of the facts of the case, any further than they stand necessarily connected with the questions of law on the bill of exceptions, for the reason that it belonged to the jury to weigh and draw the proper conclusion from the evidence. Only a part of the testimony has been detailed in the case. But if all the evidence had been spread upon the record, and there were any reason to doubt that the verdict was warranted by the facts of the case, we should have no power to interfere on that ground.

On a careful and most anxious consideration of the whole case, I have not been able to bring my mind to the conclusion, that any error in matter of law was committed by the court below, and I am therefore of opinion that a new trial should be denied.

*By the* CHIEF JUSTICE. My brethren having arrived at different conclusions upon some of the material questions involved in this case, it becomes necessary that I should express my views, which I will proceed briefly to do.

UTICA,
July, 1838.

The People
v.
Rector.

The first question arises upon the exclusion by the court of the evidence offered in vindication of the general character of a witness, who gave most important testimony in behalf of the prisoner ; so much so, that in all probability, if the jury had believed him, the trial would have resulted in a conviction of *manslaughter* instead of *murder*. This question, therefore, is interesting, not only in respect to the influence and effect its determination may have upon this particular case, but is important as it regards the general administration of criminal justice. The counsel for the people, on the cross-examination of this witness, drew from him some facts and circumstances concerning his general conduct and habits of life, the direct and inevitable tendency of which, was to impeach his moral character, and thereby invalidate his testimony in chief. This consequence is not denied, nor but that it had a preponderating influence with the jury. Indeed they might well have been justified in totally disregarding it. The direction thus given to the cross-examination was no doubt proper, and beyond the control of the prisoner, for the people were entitled to a scrutiny of the life and character of his witness with a view to bring before the court and jury the means of deciding understandingly upon the degree of credit belonging to him. The witness might have interposed his privilege, and thereby avoided the publicity of his own degradation. The prisoner could not.

The degree of credit to be given to a witness must chiefly depend upon his means of knowing the facts testified to : upon his general understanding and intelligence, together with the integrity and truth with which he is supposed to narrate them—the consideration of character becomes thereby involved. The two first qualifications are necessarily disclosed in the progress of the examination, as his means of knowledge and general understanding there directly appear ; and as every man is presumed to be innocent and honest till the contrary is shown, the jury are bound to acknowledge good character in the first instance. Hence the *onus* lies upon the party denying, to disprove it, affirmatively, and thereby overcome the charitable presumption of the law. There are various ways by which

UTICA,
July, 1838.

The People
v.
Rector.

this may be effected; the most usual is by calling witnesses as to his general character for truth in the place where he resides. These speak directly upon the point, and if they pronounce it bad, so much so that they would not believe him under oath, then, though the facts to which he has testified are uncontradicted, they may, and usually should be disregarded, on account of want of confidence in the truth of the narrator. He is thus shown to be devoid of those high moral qualities deemed indispensable by the law, [to secure the utterance of truth, "the whole truth, and nothing but the truth." But this impeaching evidence may be met and rebutted; what may be proved on the one side, may be disproved by the other—thus the party whose witness is assailed, may fortify and support him by evidence in reply, showing that his character for truth and integrity is good, or at least not bad to the degree sought to be established. In this way, the presumption of good character is wholly or measurably sustained, depending upon the number and the weight of the impeaching and supporting witnesses. Thus a collateral issue, aside from the principal one in the case, is raised, involving simply the credit of a witness, and which must in some degree perplex and embarrass the progress of the trial of the principal issue; but which, as must be obvious to all, is essential to the developement of truth, and to an intelligible and safe administration of justice between party and party, or people and prisoner.

Now, what is the ground and reason for allowing a party to introduce general evidence in reply to fortify and support a witness who has been impeached? It surely is not because the impeachment has been effected by the testimony of witnesses, or by general evidence as to character, or in a particular way—all this of itself can be of no great importance—but it is because the impeachment, the effect of the proof, in whatever way introduced, tends directly to overcome the presumption of good character upon which the party had a right in the first instance to rely; because a material part of his proof is struck at by shaking confidence in the integrity and truth of the witness upon whom it depends. For this reason the presumption of good character

UTICA,
July, 1838.

The People
v.
Rector.

may no longer exist; it may have been overthrown by the force of affirmative evidence, and the facts which were proved, and material to the support of the principal issue, before dependent upon this presumption, must stand or fall by evidence rebutting the impeachment; if that can be removed, the presumption revives, and the facts are again sustained upon the good character of the witness.

Regarding then the principle upon which testimony in reply to the impeachment of a witness is admitted, and the grounds and reasons upon which it rests, the court should rather look to the effect of the impeachment, than to the mode and manner in which it is brought about. It can be of little concern to a party whether the moral character of his witness is destroyed by the testimony of others called to speak to it, or by a cross-examination. The effect upon him, to the extent of the impeachment, is exactly the same : he loses the benefit of the evidence in both cases, and for the same cause—the discredit of his witness. If it be competent then to rebut the effect of the impeachment in the one case, and thereby reinstate the character and credit of the witness, I am incapable of comprehending the distinction that would deny the like indulgence to the other. This inconsistency in admitting evidence in reply, where character is impeached by general evidence, and denying it where the same effect is produced by the cross-examination, will more fully appear by recurring briefly to the case under consideration. I lay out of view the contradiction of the facts testified to by Gillespie, by other witnesses in behalf of the people—this lays no foundation for general evidence in reply ; it does not necessarily implicate character ; it may turn upon a question of memory, and exist where all the witnesses are equally honest. I will also omit the contradictory relation of the transaction given by this witness out of court, when compared with that under oath—though that may well have tended to impeachment—and come to that part of the cross-examination, where evidence is drawn from him directly touching his moral character. Why was it called out ? The counsel could not but avow the object to be to invalidate his character for truth, and in that way destroy his

credit before the jury in the particular case on trial; nor can we doubt such was the effect of it. Facts coming from the witness himself, tending to impeachment, above all others, must have operated with a preponderating weight without countervailing proof, they rightfully might become overwhelming, and his credit utterly destroyed. The counsel for the prisoner, sensible of this effect, and also of the importance of the testimony in the defence; thus turning upon the credit of the witness proposed to give the usual evidence in reply, his general good character for truth in the place where he resided. Why was the evidence denied? Not, certainly, because it would not tend to fortify and support the credit of the witness and thus aid in the pursuit of truth; that such would be its tendency is not denied or doubted. There may, indeed, be more difficulty in the reply, in the case of an impeachment by cross-examination, than from general evidence. Each case will vary, in this respect, according to its particular circumstances, depending upon the degree of discredit attached to them. But there is no intrinsic difficulty rendering a vindication impossible; the offer of the proof assumes that it is within the power of the party. Cases may very well occur of particular vices and weaknesses, which cast a cloud over the moral character of the man, and tend *prima facie* to impeach his truth and integrity, but whose veracity could be vindicated by the concurrent testimony of all his neighbors and acquaintances. It requires but a casual observation of human nature in its various phases, to be sensible of this truth.

Indeed, it has not been denied, that the evidence in reply is relevant, and might be effectual in sustaining the credit of the witness; but it is urged that, as the witness is upon the stand, he may be examined himself in explanation of the impeaching facts. The obvious answer to this is, that the character of the witness for truth in the given case is proposed to be sustained by the evidence in reply, notwithstanding the existence of the facts called out on the cross-examination. The case supposes explanation impossible, but that still his character for truth may be upheld by his neighbors and acquaintances.

Again ; it is said that the admission of the evidence in reply would raise collateral issues upon the *credit* of witnesses, which would embarrass the progress of the trial. It has already appeared that the issue thereby raised will be the usual one on the impeachment by general evidence ; and I do not perceive why the argument is not as applicable to the one case as to the other, as the effect of the impeachment is the same in both ; it is certain that the reason which justifies embarrassment or consumption of time in one case exists with full force in the other.

If then I am right in the view above taken of the law in respect to the point in question, it follows that the court below erred in the rejection of the evidence, and that a new trial must be granted. General proof of good moral character was allowed, but that for truth which was rejected, as we have seen, was most especially pertinent, and legal.

With respect to the exclusion of the evidence offered on behalf of the prisoner, of a riotous assault upon his dwelling on the night of the previous Saturday, (seven days previous,) and of the threat to return and repeat it, it may be proper to say a word. This proof was offered with a view to show that the prisoner had some ground for the apprehension of violence upon his dwelling and inmates, when the deceased and his companions first appeared and commenced beating at the door ; and that under the influence of it, a degree of resistance was excusable, which might otherwise be considered disproportioned to the actual danger. That the law regards this sort of palliation for an excess of resistance in case of an unlawful assault upon the person or property of the citizen, is not denied ; the only question here is, whether the proposed proof brought the case within it. If I had been sitting upon the trial, I would have admitted the evidence, though I cannot but see, looking at the whole case, that it could not possibly have had much if any influence upon the minds of the jury. If the new trial turned upon it, I might hesitate before granting it. It has already appeared that some of these rioters were subsequently admitted as guests in the house, a fact that goes far to satisfy the mind that no well founded apprehen-

sion existed; still I would not have decided, as *matter of law*, that this was the necessary conclusion upon the facts.

After the submission of the case to the jury, the counsel requested the court to add to the charge, that if they came to the conclusion that the prisoner inflicted the mortal wound upon the deceased in an attempt to commit [in the act of committing] an offence which, of itself, was less than a felony, then he should not be convicted of murder : which was refused, the presiding judge saying that it was inapplicable to the case. He had, as the case discloses previously, in his charge stated the specific language of the revised statutes, which defined the crimes of murder and of manslaughter in their several degrees. By this, I understand, that the court had already placed the case before the jury in the aspect of *murder* and *manslaughter*, accompanied with such an exposition of the rules of law as was called for, together with their application to the evidence; and that all this was done in a way satisfactory to the counsel for the prisoner, as no exception was taken. We are to assume, therefore, that the jury had already been properly instructed, under what view of the facts disclosed their verdict should be that the prisoner was guilty of *manslaughter*, as well as the view which might warrant the higher conviction for *murder*. The proposition then which the court were requested to submit, at this stage of the trial, seems to go the length of withdrawing from the jury the consideration of the higher offence ; for it assumes, that if they believed the prisoner was attempting to commit or was in the act of committing an offence less than a felony, then upon no view of the facts of the case would they be warranted in finding him guilty of murder. These are not only the terms, but it is the fair import of the request.

The statute, 2 R. S. 657, § 5, sub. 2, makes the killing murder, " when perpetrated by *any act* imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated *design to effect the death* of any particular individual." Within this provision, the offence may be committed when the actual intent at the time may be to commit an offence under the

UTICA,
July, 1838.

The People
v.
Rector.

UTICA,
July, 1838.

The People
v.
Rector.

degree of felony ; it may be simply to commit an assault or battery, and still if death ensue under the circumstances alluded to in the clause of the statute, the killing may be murder.  Regarding then the facts disclosed, if the counsel intended that the case should be confined to the rule suggested by them, the answer given was correct.  The court ought not, as matter of law, to have taken it altogether out of this provision, and thus have excluded it from the jury. I concede, if the refusal to charge as requested is to be construed in a way to make the court appear as having laid down the position, that upon the facts as disclosed in the particular case the jury had nothing to do with the view that might bring it within some of the degrees of manslaughter, then it was erroneous.  For, independently of the opinion of the medical gentlemen who were examined upon the question of the second blow, which I think were carried too far, as clearly appears from the authorities referred to by my brother Cowen, the evidence was extremely slight and unsatisfactory ; and without maintaining this, the case could not have ranged beyond the crime of manslaughter in the first degree.

Upon the whole, I concur in the conclusion, principally on the first point considered, that the conviction must be set aside and a new trial granted.  The proceedings to be remitted to the court of oyer and terminer, in and for the county of Albany, with directions to award a *venire de novo,* and the prisoner to be remanded.

Ordered accordingly.