Bronson, J.
The defendant attempted to discredit the testimony of the witness Huldah T. Hulse, 1. By showing on her cross-examination that her story was improbable in itself; 2. By disproving some of the facts to which she testified ; 3. By showing that her conduct, while on board the vessel and after her arrival at Bellport, was inconsistent with the sup position that the alleged offence had been committed; and 4, By proving that the account which she had given of the matter out of court did not in all respects correspond with her statements as a witness. The cross-examination did not extend beyond matters pertinent to the issue; and neither in that, nor in the evidence of other witnesses, was there any attempt to impeach her general character. In such a case the public prosecutor was not at liberty to call witnesses to the general *313 good character of the complainant, and the court below erred in receiving the evidence. The cases on this subject were fully considered in The People v. Rector, (19 Wend. 569.)
The general rule is, that a party can only give evidence of the good character of his witness where impeaching witnesses have been first called on the other side. By impeaching witnesses I mean such as have spoken to general character, or character for truth, and not such as have merely given a different account of the facts, or proved that the witness has made declarations out of court inconsistent with his testimony on the trial. The question of character must be made by the opposite party, and not by the one who calls the witness. There is one case, and 1 believe only one, in the English courts which departs from the general rule that such evidence is only admissible in answer to impeaching witnesses on the other side. In Rex v. Clarke, (2 Stark, Rep. 241,) the prosecutrix admitted on her cross-examination that she had some years before been twice sent to the house of correction on charges of having stolen money from her master; and Holroyd, J. admitted evidence to show that her subsequent conduct had been good. He thought the evidence admissible where the character of the witness was attacked upon the cross-examination, as well as where the impeachment arose aliunde. This decision seems not to have been regarded as sound law in Doe v. Harris, (7 Car. & Payne, 330,) which was tried nearly twenty years afterwards. The defendant called the solicitor who drew the will to prove its execution, and “ in the cross-examination of the witness it was sought to impeach his character ; and it was proposed by the defendant’s counsel to call witnesses to prove his good character.” But Coleridge, J. said,£< this may be done when the attorney who prepared the will is dead, but I have never known such evidence received when he is alive ;” and it was rejected. But taking the case of Rex v. Clarke for good law, it only proves, that where there has been an attack, in the cross-examination, upon the moral character of the witness, as by showing him formerly guilty of a crime, evidence *314 of subsequent good conduct may be received, although impeaching witnesses have not been called.
Mr. Phillipps in the 7th edition of his valuable book upon evidence, says : “ In answer to evidence of contradictory statements, and for the purpose of corroborating the testimony of the witness whose veracity has been thus impeached, it seems reasonable to be allowed to show that he is a man of the strictest integrity, and of scrupulous regard to truth.” (Vol. l,p. 306, 307.) But he cites no authority in support of the position. This saying of Phillipps has been since mentioned by Mr. Green-leaf, but not in such a way as to signify his approval of the doctrine. (Greenl. Ev. 521.) I want the authority of an adjudged case for such an innovation upon the rules of evidence.
In The People v. Rector, (19 Wend. 569,) it was shown by the cross-examination that the witness was a man of grossly immoral habits and conduct, and it was held that evidence was admissible in reply, to show that the general character of the witness for truth was good. The rule with us, then, seems to be this: Where a party attacks the general character of a witness on the other side, either by calling impeaching witnesses, or by drawing out extrinsic facts going to general character on the cross-examination, sustaining evidence may be given in reply.(a) That rule does not warrant the course which was pursued on this trial. There had been no attack in any form upon the general character of the witness.
I said something in The People v. Rector, about the dangerous tendency of collateral issues upon character • and this case has fully confirmed my previous impressions.. No one can read the evidence without feeling the painful apprehension that the attention of the jury was drawn off from the true point in controversy, and that the verdict stands more upon the general good character of the prosecuting witness, than it does upon a rational conviction of the defendant’s guilt. But it is enough that the evidence was improperly received.
We are referred to the authority of Lord Hale, to show that *315 the case of a woman swearing to a rape, forms an exception to the general rule, and that evidence may always be given in support of her general character. It is true that Hale mentions the u good fame” of the witness as one of the “ concurring evidences to give greater probability to her testimony;” but he no where intimates that she may call compurgators before the question of character or <c good fame” has been raised on the part of the defence. (1 Hale P. C. 633, ed. of 1778.) And although what is here said by Hale has been repeated by most of the elementary writers upon crimes and criminal evidence since his day, not one of them has mentioned the ease of a woman swearing to a rape as an exception to the general rule of evidence which we have been considering. (4 Black. Com. 213 ; 1 East P. C. 445 ; 3 Chit. Cr. Law, 812 ; 3 Stark. Ev. 1267 ; Roscoe’s Cr. Ev. 710 ; Archb. Cr. Plead. 453.) If there be any such exception, we should certainly be able to find it laid down in some book of authority. Mr. Phillipps, although he had no occasion to controvert a proposition of which he had never heard, has virtually denied the existence of any such exception. He says, if on cross-examination she admit her own misconduct in some earlier transactions, it would be proper on re-examination, to inquire into her conduct subsequent to such transactions, for the purpose of restoring her credit. And then, on the authority of Rex v. Clarke, he adds— other witnesses may also be called, to show that she has since retrieved her character. (1 Phil. Ev. 176, ed. of 1839.) He puts the right to call sustaining witnesses on the ground that her character had been attacked.
But I must return again to Sir Matthew Hale, one of the greatest and best men that ever lived, and whose learning and experience as a judge entitle his opinions to the highest consideration. If he had thought that there was any such exception as that for which the counsel contend, it would have gone very far towards settling the question. But no one can read what he has said in relation to prosecutions of this kind without being satisfied, that greatly as he abhorred the crime of *316 rape, He was very far from thinking that any unusual weight should be thrown into the scale against the accused. On the contrary, he regarded it as a case calling for unusual caution on the part of the judge and the jury, and where the testimony of the complaining witness should be received with more thpn ordinary doubt and suspicion. In the passage already mentioned, he lays down rules for testing the credibility of the principal witness which should never be lost sight of upon trials of this character, and plainly intimates that there should be proof of corroborating circumstances by other witnesses. And at p. 635, he says : “ It is true that rape is a most detestable crime, and therefore ought severely and impartially to be punished with death ; but it must be remembered that it is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, though never so innocent.” He then mentions several cases of unfounded and malicious prosecutions for rape, and among them a remarkable trial before himself, where, although the rape was u fully sworn,” it turned out upon inspection to be physically impossible that the party accused could have been guilty of the of-fence. He adds : “ I only mention these instances, that we may be the more cautious upon trials of offences of this nature, wherein the court and jury may with so much ease be imposed upon without great care and vigilance : the heihousngss of the offence many times transporting the judge and jury with so much indignation, that they are over-hastily carried to the conviction of the person accused thereof, by the confident testimony sometimes of malicious and false witnesses.”
There is much less danger of an unjust conviction in cases where the testimony of the principal witness is wholly fabricated, than there is in cases like the one before us, where there can be no doubt that the accuser and the accused were improperly together, and the only controverted question is, whether the connection was brought about by mere force. In such cases, although the woman never said “ yes”—-nay more, although she constantly said “ no,” and kept up a decent show of resistance *317 to the last, it may still be that she more than half consented to the ravishment. Her negative may have been so irresolute and undecided, and she may have made such feeble fight as was calculated to encourage, rather than repel the attack. And yet a sense of shame, arising either from an apprehension of the consequences which may follow the illicit connection, or from the fact that the matter has already become known to others, may stimulate the woman to call that a rape, which was in truth a sin of a much less odious character. And when once she has given the transaction a name, she has no alternative but to confess herself false, as well as guilty, or to go into court and arraign the supposed offender. And then, as there was no express consent, she is enabled to swear to the force without any such great stretch of conscience as would be necessary where the whole story was a tissue of falsehood from beginning to end. Cases of this character do not call for any relaxation of the rules of evidence for the purpose of supporting the accusation. On the contrary, courts and juries cannot well be too cautious in scrutinizing the testimony of the complaining witness, and guarding themselves against the influence of those indignant feelings which are so naturally excited by the enormity of the alleged offence. Although no unreasonable suspicion should be indulged against the accuser, and no sympathy should be felt for the accused, if guilty, there is much greater danger that injustice may be done to the defendant in cases of this kind, than there is in prosecutions of any other character. The evidence, if it amounts to any thing, is always direct; and whatever may be the just force of countervailing circumstances, honest and unsuspecting jurors may think themselves bound of necessity to credit that which is positively sworn—especially if the witness is supported by proof of good character.
The question whether such evidence was admissible rvhen the character of the witness had not been attacked, came before the supreme court of Connecticut in The State v. De Wolf (8 Conn. R. 93,) but it was left undecided. Dagget, J. thought *318 the evidence admissible, because the witness was deaf and dumb, and he likened it to the case of a witness who was a stranger, passing transiently through the state, where he thought the character of the witness might be proved by the prosecuting attorney. But the case went off upon other grounds.
I have met with no authority for making the case of a witness swearing to a rape, an exception to the general rule of evidence in relation to proof of character; and as a question of principle, I think no such exception should be made.
Enough has been said to dispose of the case; but as there is another question which, in one view of it, may put an end to the prosecution in its present form, it is proper that it should be considered. Was the indictment found and tried in the proper county 1 It is provided by statute, that “ when any of-fence shall have been committed within this state, on board of any vessel navigating any river, lake or canal, an indictment for the same may be found in any county through which, or any part of which, such vessel may be navigated in the course of the same voyage or trip, or in the county where such voyage or trip shall terminate ;” and such indictment may be tried in the county where it is found. (2 R. S. 727, § 44.) Three questions have been made upon this statute: 1. Whether it applies to a case where the crime was committed while the vessel xvas lying at anchor; 2. Whether it applies to any case except where the voyage both commences and ends within the river; and 3. Conceding that it applies where one of the termini of the voyage is beyond the mouth of the river, then, whether the offence can be tried in any county except some one through which the vessel passed while in the river.
I. The words of the statute which affect the first question, are as follows : “ When any offence shall have been committed within this state, on board of any vessel navigating any river.” The offence was committed u within this state,” and the only doubt is, whether the vessel was u navigating” the river within the meaning of the statute, while she lay at anchor. I think she was. The vessel had sailed on a voyage which was never *319 broken up or abandoned, but was regularly prosecuted until it terminated in the port of destination. She only lay at anchor so long as she was necessarily detained by adverse winds, and then it was not in any port. Although the vessel had thus lain at anchor for two days before the offence was committed, she was nevertheless on her “ voyage” and “ navigating” the river within the meaning of the statute. A different construction would amount to a virtual repeal of the statute, especially when applied to boats or vessels navigating a “ canal.” If the vessel must necessarily be in motion, it would then be incumbent on the public prosecutor to show that the offence was committed while the vessel was actually passing through the water ; and as our canal boats are at rest many times in a day for the purpose of changing horses, waiting their turn at the locks, taking in and discharging freight and the like, it would in most cases be utterly impossible to ascertain whether the of-fence came within the statute. It also frequently happens that vessels on the river are obliged to come to anchor for the purpose of obtaining supplies from the shore, or in consequence of calms and adverse winds. And they may also get upon shoals and be obliged to wait for the tide, or until a lighter can be employed, before they can again get afloat. I cannot suppose that pie legislature intended to make so idle a statute as this must/'prove, if it do not extend to the whole voyage, although the vessel may occasionally be at rest.
This is not, properly speaking, a penal statute. It neither creates the offence, prescribes the punishment, nor alters the mode oil trial. It merely changes the venue, and I think we are not/bound to give it such a straitened construction as will turn it/into legal nonsense. The legislature has spoken of a Tiartifcular kind of business or employment, and we are bound to u.'nderstand their language as men engaged in that kind of business would understand it • and I think no seaman or waterman would doubt that this vessel was “ navigating” the ri/rer, although it happened to be temporarily at rest in consequence of adverse winds when the crime was committed. --
*320 There is another statute which provides, that “ whenever any vessel navigating” the river “ shall be at anchor in the night time,” the master shall keep a light in the rigging. (1 R. S. 685, § 12.) This shows that the legislature thought a vessel might properly be said to be navigating the river, although at the particular time she was lying at anchor.
2. I see no reason why this provision should be restricted to cases where the voyage both commences and ends within the river. There is nothing in the letter, nor, so far as I can discover, in the spirit of the provision, which should lead to so narrow a construction. When the offence is committed while the vessel is in the river and on a voyage, it matters not, I think, where she came from, or whither she is bound. A ship trading between New-York and Heliport, or, to take the case put by the defendant’s counsel, between New-York and Liverpool, comes as plainly within the language of the statute as to that part of the voyage which is performed within the fauces terree, as does a sloop or boat trading between Albany and New-York. And why should not the. statute reach the one case as well as the other 1 The same reason applies to both cases. There may be the same difficulty in ascertaining in what particular county the offence was comihitted, whether the vessel trades to Liverpool, or only sails from New-York to the south side of Staten Island, or to Coney Islánd cove. It is, I think, enough that the vessel was on a voyage and navigating the river at the time the offence was committed.
3. The only remaining inquiry on this branch of the case is, whether the indictment should not have been found '¡and tried in one of the counties through which, or a part of wMch, the vessel passed while in the river; to wit, New-York orV Kings, or, possibly, Richmond. The voyage commenced at\New-York, and ended at a port on the Atlantic, in the county of Suffolk, and there the defendant has been indicted and tojed. The letter of the statute may, perhaps, be broad enough to ¡authorize an indictment in Suffolk ; but on looking at the reaston and policy of the law, I have come to the conclusion that there *321 has been a mis-trial. In relation to crimes on board of vessels navigating the Hudson, it may often be nearly or quite impossible to ascertain in what particular county the offence was committed, and this difficulty might lead to the acquittal of the accused, although his guilt should be fully established. This was the mischief against which the statute was principally directed. It is quite clear that the offence must be committed while the vessel is in the river, and there seems to be no sufficient reason for allowing a trial in any county where the of* fence.provided for by the statute could not have been committed. It would be carrying the remedy beyond the mischief which the legislature had in view, and sanctioning an unnecessary departure from that salutary rule of the common law which confines the trial to the vicinity where the crime was committed.
The defendant was right in both of his exceptions, and the verdict must consequently be set aside. But as the objection to the jurisdiction of the Suffolk oyer and terminer goes to the foundation of the present proceeding, there can be no use in ordering a new trial, and as the indictment has been removed into this court, (2 R. S. 736, § 27,) the proper course will be to quash it.
Nelson, Ch, J. concurred.
Cowen, J.
I think the court below erred in holding that the oyer and terminer of Suffolk county, had jurisdiction. The offence was committed in the county of Kings. It was indeed on board a vessel navigating a river; and the venue was laid in Suffolk, where the voyage or trip terminated It is therefore literally within the 2 R. S. 608, 2d ed. §44. It appears to me, however, that this statute was intended of a. termination on the water where the crime was committed. The statute is, that when an offence shall have been committed on board of a vessel navigating any river, lake or canal, an indictment may be found and a conviction had in any county *322 through which such vessel shall be navigated in the course-of the same voyage or trip, or in the county where such voyage or trip shall terminate. I think the statute should be read, such voyage or trip on the same river, lake or canal. I have felt some doubt upon the construction ; but the statute departs from the common law, and I do not feel authorized to give it a greater departure than what it necessarily requires.
As to the evidence touching- the good character of the prosecutrix, I am not disposed to insist that where two witnesses differ as to a fact in the cause, this opens an inquiry into their characters ;(b) but when it is shown that a witness has made contradictory statements out of doors, the only object is to destroy his credibility. The inference sought to, he raised is, that he is dishonest and destitute of veracity. That touches his general character; and I am still inclined, as I was in The People v. Rector, (19 Wend. Rep. 584,) to agree with Mr. Phillipps, who says, “ In answer to the evidence of contradictory statements, and for the purpose of corroborating the testimony of the witness, whose veracity has been impeached, it seems reasonable to be allowed to show that he is a man of the strictest integrity, and of scrupulous regard to truth.” (1 Phil. Ev. 306, 7,7th ed.) The same proposition is,, I see, reiterated in the eighth edition, by Phillipps & Amos, p. 944.
Indictment quashed..

 See S. P. Carter v. The People, (2 Hill, 317.)

 See Braddec v. Brownfield, (9 Watts' Rep, 124.)