The offence of murder, though the most heinous crime which can be committed against an individual, had not, either in England or in this state, been subjected to a legislative definition, until it was done in the enactment of the Revised Statutes in the year 1830. By the ancient common law, the distinction in felonious homicide between a killing with or without malice was merely nominal, both being indiscriminately punished with death. It was said that although the malice made the fact more odious, yet it was nothing more than the manner of the fact, and not the substance; and the term manslaughter was used to define the offence in both cases. But when the benefit of clergy was, by statute, taken away from murderers with malice prepense, the more modern distinction between that most aggravated form of homicide and the inferior grades came to be recognized, so that, at the period when we succeeded to the English common law, the legal definition of murder was well established. (4 Reeves' Hist. Eng.Law, 393, 534 to 536; 5 id., 220 to 223; Foster's CrownLaw, 302 to 306; 4 Bl. Com., *Page 150 
201.) The act concerning murder in the revision of 1813 did not attempt a definition of the offence, but was limited to the reënactment of several English statutes providing for a few particular cases of homicide, bringing them within or exempting them from the penalties of murder. (1 R.L., 66.) The description of the offence, then, which had prevailed for several centuries prior to 1830, was this: "Where a man of sound memory and of the age of discretion unlawfully killeth any reasonable creature with malice prepense (or aforethought.)" (Coke's
3d Inst., 47; 1 Hale's P.C., 449, 450; 4 Bl. Com., 195.) The words malice prepense acquired a peculiar significance on account of their use in the statute 23 Henry VIII., ch. 1. That act provided that if any not actually in holy orders should be found guilty (among other crimes) of "any wilful murder ofmalice prepensed," they should be utterly excluded from the benefit of their clergy, and suffer death in such manner and form "as if they were no clerks." From that time the words referred to became indispensable in the definition of the offence, as only a nominal punishment could be inflicted if malice were not established by the verdict; and from thence, also, the inferior grades of felonious homicide came to be called manslaughter, while the capital offence was denominated murder. And where a capital conviction was sought, it was said to be indispensable that the indictment should contain the words "ex malitia suapræcogitata interfecit et murdravit." (1 Hale P.C., 450.) Though the words in their ordinary sense conveyed the idea of deadly animosity against the deceased, and by a strict interpretation would, perhaps, only embrace cases of a killing from motives of revenge, they were not so limited by the construction of the courts. All homicides, for which no excuse or palliation was proved, and a large class where there was no actual intention to effect the death of the person killed, were held to be murder. To justify these convictions an artificial meaning was attached to the words malice prepense, by which they were *Page 151 
made to qualify the taking of human life in all cases where sound policy or the demerits of the offender were supposed to require that he should be capitally convicted. Hence, the definitions of murder to which I have referred contain the addition that the malice may be express or implied. But in drawing the distinction between the two classes, great confusion was introduced. COKE, for instance, classes among instances of implied malice, the case of poisoning, and all cases of the killing of another without any provocation in him that is slain; though it would seem that a wilful poisoning afforded the strongest evidence of deliberate malice, while in the other case, supposing no explanatory evidence to be given, actual malice ought to be found as a matter of fact upon the evidence. (3Inst., 52.) HALE includes in the class of malice in fact, the case of killing from a deliberate compassing and design to do some bodily injury, and instances Halloway's case, where the prisoner tied a lad, who was found trespassing, to his horse's tail, and he was dragged till his shoulder was broken, whereof he died. (1 Hale P.C., 451, 454; Halloway's case, Cro. Car.,
131.) So, he says, if a master designeth an immoderate and unreasonable correction of his servant, either in respect to the measure or the instrument, and death ensues, it is murder from express malice; and so of a school-master toward his scholar. (P. 454.) This author, in his chapter of "murder by malice implied or malice in law," includes in that class cases where the homicide is committed without provocation, where it is upon an officer or minister of justice, and where by a person that intends theft or burglary, c. In the first division (murder without provocation), the cases present merely a rule of evidence. As the law holds that a man intends the natural consequences of his own acts, it determines that where there is no provocation, or where there has been time for the blood to cool, the killing must be designed and intentional. As was said by COLERIDGE, J., in Regina v. Kirkham (8 Carr. Payne,
115), "Every one must be presumed to *Page 152 
intend the natural consequence of his acts. If you throw a stone at a window, it must be taken that you intend to break it, because it is a brittle substance. That being so, if you had heard nothing more than simply that the prisoner, taking a knife in his hand, had stabbed his son, that would have put it on him to clear himself from the charge of murder." In cases of this kind, if the prisoner could show positively that his intention was not to kill the deceased, he would, of course, be acquitted. In the other instances, on account of the intention to do some other illegal act not touching life, the presumption is juris etde jure, and the most conclusive evidence that death was not intended would not help the prisoner. Take, for example, the case of a homicide by one engaged in committing a burglary. The party killed may have been a stranger, or even the nearest friend of the prisoner, and he may be able to show in the most conclusive manner that lucre was his only object, and that murder was not in all his thoughts; still, he was, by law, guilty of murder with malice aforethought.
These references are sufficient to show that the term maliceprepense had been made the subject of much and not always perfectly intelligible refinement. Malice in law, or implied malice, was sometimes simply a conclusion from the facts, and liable to be overcome by the proof of other facts, and at other times it was an irresistible legal inference which could not be rebutted. So far from being a descriptive term to be applied as a test to cases as they should arise, it had become simply a part of the name to be given to the offence when its existence had been ascertained by other tests. It was probably for this reason that the expression was wholly omitted in the revised code. The object of the revisors and of the legislature was to define the offence by the use of language in its ordinary sense, omitting a phrase which, though it had become technical, tended to mislead rather than to instruct. The provision respecting murder, as proposed by the revisors, was as follows: *Page 153 
"§ 4. The killing of a human being without the authority of law, by poison, shooting, stabbing, or any other means, or in any other manner, is either murder, manslaughter, or excusable or justifiable homicide according to the facts and circumstances of each case.
"§ 5. Such killing, unless it be manslaughter, or excusable or justifiable homicide, as hereinafter provided, shall be murder in the following cases: 1. When perpetrated from a premeditated design to effect the death of the person killed, or of any human being; 2. When perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual; 3. When perpetrated without any design to effect death, by a person engaged in the commission of any felony; 4. When perpetrated from a premeditated design to dosome great bodily injury, although without a design to effectdeath." (3 R.S., 2d ed., 808.)
The legislature was at the same time informed by the revisors that a lamentable uncertainty prevailed in regard to the distinction between murder and manslaughter, that nothing was so much needed as a settled line of distinction between them, and that the first step to such a distinction was the definition of murder. (Id.)
These provisions were enacted precisely as reported, except the fourth subdivision of the 5th section, which was rejected. (2R.S., 656.) It thenceforward became the duty of the courts, by an attentive consideration of the language of these enactments, to ascertain in each case presented for adjudication whether the alleged offence came within the statute. The case of the plaintiff in error would have been of easy solution as the law stood before the revision. The deceased died by his hands, and the bill of exceptions states that there was no evidence given to show any provocation on her part. It was a homicide wholly unexplained. It was also a case of cruel and inhuman violence, unrelieved by provocation or *Page 154 
the heat of passion, and of a design to do some great bodily harm, from which death resulted, possibly without its being contemplated by the accused. In either case, as a homicide unexplained, or a killing by cruel violence unprovoked, it was murder by the common law. Whether, under the statute, the jury would have been authorized to find a premeditated design to effect her death, within the meaning of the first subdivision of the fifth section, is a question not before us, and upon which it would be improper to express an opinion. That question was not presented to the jury. The precise question is whether the second subdivision embraces the case of killing by an unprovoked and cruel beating, the accused not intending to take life. Had the fourth subdivision, as reported, been enacted, it would precisely have met the case. I do not rely very much upon its having been reported and rejected by the legislature. It may have been because they did not intend to punish such a case as murder, and it may have been because it was considered as embraced in the prior provisions. It is, however, a circumstance of some moment, as it would rather be presumed that where a case of frequent occurrence was well described in the projected law, the provision would have been adopted, instead of leaving it to be dealt with by a construction upon other provisions less accurately adapted to the case. This consideration is strengthened by the circumstance that a homicide committed in the attempt to do a great bodily injury short of death, without or on insufficient provocation, formed a distinct head of the law of murder by the common law. (See, in addition to the books referred to, Foster'sCrown Law, 262, 291, 296; 4 Bl. Com., 199; Rex v. Reason,
1 Stra., 500; Arch. Cr. Pl., 394.) In ascertaining the meaning of the second subdivision, upon which the plaintiff in error was convicted, it is necessary to look into other instances of murder at the common law, where it is not necessary that there should be any intention to take the life of the person killed. I refer to cases where death was the *Page 155 
collateral consequence of the act, which itself was highly criminal. Foster says, that "if an act unlawful in itself be done deliberately and with intention of mischief or great bodily harm to particulars, or of mischief indiscriminately, fall it whereit may, and death ensue against or beside the original intention of the party, it will be murder." (P. 261.) One branch of the offence here referred to is, in a modified form, provided for in the first subdivision. A premeditated design to effect the death of "any human being" is made murder, though the person killed was not at all within the intention of the offender. (See The Queen
v. Saunders, Plowd., 473.) Then as to the intent to do mischief indiscriminately, by which is meant such as is deadly or very dangerous: almost every writer on criminal law has a division of murder from general malice or a depraved inclination to mischief, fall where it may. (1 East's P.C., 231; Hale, 476; 4 Bl.Com., 200; 1 Hawk., ch. 29, § 12, and ch. 31, § 61.) The act must be itself unlawful, attended with probable serious danger, and must be done with a malicious intent to hurt people. (East,supra.) The instances given are, riding an unruly horse among a crowd of people, the probable danger being great and apparent; throwing a heavy stone into the street when multitudes are passing; firing a gun into a crowd, and the like. No one will deny but that the second subdivision of the 5th section very accurately describes the particular instance of murder just referred to; but the question is whether it is not limited to that, and whether it fairly extends to cases where the intention and the act refer only to the person killed; where the evil intention, whether more or less wicked, has for its object the party who ultimately becomes the victim. The language does not seem to me designed to embrace the last mentioned case. In the first place, the act causing death must be one imminently dangerous to others. Why should the greater or less degree of danger be an ingredient, when the case supposes that the party against whom it was directed and for whom it was *Page 156 
intended was killed by it? It must be dangerous to others. The plural form is used; and though I am aware that by a general provision of the Revised Statutes the plural may be construed to include the singular, I conceive that where a precise definition was intended, and where the distinction between general and particular malice must have been in the mind of the legislature, the case of imminent danger to the person killed would have been specified had it been intended to embrace it. (2 R.S., 778.) The act must evince a depraved mind, regardless of human life. These words are exactly descriptive of general malice, and cannot be fairly applied to any affection of the mind having for its object a particular individual. They define general recklessness, and are not pertinent to describe cruelty to an individual. The act by which the death is effected must evince a disregard to human life. Now, a brutal assault upon an individual may evince animosity and hate towards that person, and a cruel and revengeful disposition, but it could not properly be said to be evidence of a recklessness and disregard of human life generally. Take the case of death ensuing from an intentional immoderate punishment of a servant. The act would be evidence of a disregard of the life of the servant, but not of human life in a general sense. The life of every one, we know, is a human life; but the words are used in this enactment in a general sense, as clearly as when we speak of the uncertainty of human life, or the miseries, the pleasures, or the vanity of human life. Again, the killing must be without any premeditated design to effect the death of any particular individual. Why did not the legislature say, of the person killed? or, if it were intended to embrace both general and particular malice, of the person killed, or ofany particular individual? The first subdivision presented an example, in immediate proximity, of the phraseology suggested, where it was intended to provide as well for the case of particular malice effecting its object as for malice taking effect in a manner collateral to the intention. Upon the most careful *Page 157 
and anxious examination of the provision, I am entirely satisfied that it cannot, without violence to the intention of the legislature as evinced by the language, be applied to the case of homicide resulting from a direct assault by one person upon another.
It is not necessary to maintain that homicide from a cruel assault, without a design to effect death, could be adequately punished under the provisions respecting manslaughter. It may be that the failure to enact the provision in the revisors' report rendered a change necessary in the enactment respecting manslaughter, which was omitted through inadvertence. If so, it is a casus omissus which the legislature is alone competent to supply.
I have not overlooked the opinions incidentally expressed by Chancellor WALWORTH and Mr. Justice BRONSON, in The People v.White (24 Wend., 520) and in The People v. Rector (19Wend., 569). In neither of these cases was this question presented; and in both of their opinions, those learned judges were dissentients from the judgment of the court upon the points decided in those cases.
The judgments of the courts below should be reversed, and a new trial ordered in the court of oyer and terminer.