## H. DONALDSON *v.* THE STATE.

1. ASSAULT AND BATTERY.— To constitute an assault and battery, the intent to injure must concur with the use of unlawful violence upon the person of the assaulted party; but the slightest degree of force suffices to constitute the violence, and the intended injury may be to the feelings or the mind of the latter as well as to the corporeal person. If such injury would be the natural consequence of the violence used, the unlawful intent is presumed unless the presumption is repelled by the evidence.

2. SAME — EVIDENCE.— If in a prosecution for assault and battery the intent imputed to the accused was to injure the mind or the feelings of the assaulted party, the evidence germane to the existence of the intent may well involve the character of the assaulted party, and the surrounding circumstances:— *e. g.*, if the battery consisted in manipulating a woman without her consent, and the intent imputed was to obtain sexual knowledge of her, proof of previous illicit intercourse between the parties, or evidence that she was a public prostitute, is legitimate for the defense as tending to disprove the imputed intent, and thus bearing directly on the issue.

3. SAME.— In the case above indicated the defense was entitled to require the woman herself, though married, to answer whether there had been acts of sexual intercourse between her and the defendant prior to the alleged assault.

APPEAL from the County Court of Lamar. Tried below before the Hon. W. S. MOORE, County Judge.

The conviction was for an assault and battery upon the person of one Bama Jeffries, a female, in Lamar county, Texas, on July 15, 1880.   The fine imposed was $25.

The prosecutrix testified that she had no personal acquaintance with the defendant.   On the day that the offense is alleged to have been committed the defendant drove up to her house in a buggy.   The witness, at that time, was at the house of a neighbor, but under the impression that the defendant was her brother she returned to her house and met him, inviting him to take a seat. As she entered the room she remarked to him that her first impression was that he was her brother, and he responded by saying "I wish I was."   Witness asked "why?" and defendant said, taking witness' hand, "perhaps I would have got a kiss."   According to the testimony of this witness she protested against this familiarity, notwithstanding which, the defendant invited her to go to bed with him, and at one time, holding her hand, pressed her into a position behind a door and undertook to raise her clothes.   She protested against these liberties, and while they were transpiring the defendant's horse took fright and ran away with the buggy.   The defendant left the witness and followed and stopped the run-away horse and buggy.   The defendant held the witness against her consent until the horse ran with buggy.

Cross-examined, the witness denied personal acquaintance with the defendant, but stated that on a previous occasion she was at his barber shop with another woman who was acquainted with him.   The defendant on this occasion practiced deception in order to get the witness and the other woman in his shop, promising them a shampoo.   He made an effort to get the two women in his back room on that occasion, but the witness, discovering that it was not a decent place, declined to go into the room, and herself and companion left.   The witness denied that she had ever been in the defendant's bath

room.  The defendant had at no time sent for oranges and apples with which to treat witness, but, on the occasion of the visit to the shop spoken of, he sent for a cocoanut for the witness' companion.  Generally, on going into town, witness would see defendant standing about his barber-shop door, and they ordinarily spoke.  Witness did not tell her husband of defendant's conduct at her house, complained of in this prosecution, until the day after it transpired.  Defendant was back of witness' house on the night of the day of his misconduct, and talked with witness and her husband.  He pretended to have lost his buggy cushion.  When defendant assaulted witness he offered her a dollar, which witness refused to take, but defendant forced it into her hand; and she refused to keep it and gave it back.  Several white families and one negro woman, Ida Smith, lived near witness. She did not call for help, but ordered defendant to desist in a loud voice.  Witness went to the house of Ida Smith after the occurrence, but told her nothing about it.  Witness thinks Ida could have heard her order the defendant to desist.  The witness denied that she agreed to meet defendant at a peach tree that night for a certain calico dress.  She denied that she told Grif Williams that she so agreed, or that she told Williams that she would have said nothing about the matter if Ida Smith had not first told it.  She denied that she accepted a "treat" from defendant at a negro barbecue.  Grif Williams called on witness and her husband and told them that defendant had admitted that he had done wrong, and would pay if the matter was dropped,— that he wanted it hushed up before his wife got back.

Charles Jeffries, husband of the prosecutrix, testified that he heard nothing of the defendant's conduct toward his wife until the evening after it occurred, when she told him.  He did not know that the defendant had ever been to his house.  Ida Smith had never mentioned the matter

to him.   Grif Williams had undertaken to compromise the matter on behalf of the defendant, and had said that the latter acknowledged his wrong-doing, but wanted to hush it up before his wife returned, and keep it out of court, and to this end would pay whatever witness demanded.

On cross-examination the witness denied that he had ever told Grif Williams that he was first informed of the assault by another woman.   He did tell Williams that he would not go to see the defendant, and that defendant could do as he pleased about calling on witness.

Ida Smith testified, for the State, that she had never told Jeffries at any time about the defendant's assault upon his wife.   Did not speak of it to any one until it was common talk.   On cross-examination she said that she lived near Jeffries' house. The defendant was at that house in July, and had his horse and buggy hitched to the fence.   The horse ran away, and defendant came out of the house and followed.   Bama Jeffries, the prosecutrix, did not cry for help.   The witness heard her making some noise, and thought she was laughing.   The prosecutrix told witness nothing while defendant was at her house.   After defendant left, the prosecutrix was at the witness' house in an apparent good humor.

Grif Williams, for the defense, testified that he saw the prosecutrix at her house after the difficulty, and she told him that she would have said nothing about it if Ida Smith had not first told *something*.   She told witness that the defendant did not touch her more than to shake hands, but gave her a dollar, which she kept.   She told witness that she did not know whether or not she promised to meet the defendant that night at the peach tree, but "expected she did."   She was then in good humor. The husband of the prosecutrix told the witness that he first heard of the matter from Ida Smith.   Before the difficulty the parties were at a colored barbecue near Paris,

and witness saw defendant take the prosecutrix by an arm and escort her up to a stand and treat her.

Cross-examined, the witness said that he went to see Jeffries after the difficulty, to compromise a difficulty between him and defendant, and told Jeffries that defendant denied the conduct of which he was charged, but would pay if they would drop it, as he did not want to go into law about it. He did this at the defendant's instance, after the complaint in this case had been filed. The witness once saw the prosecutrix standing in defend· ant's shop door, and saw her and defendant go around towards the back of the shop, where there was a back door.

Homer, for the defense, testified that he worked in the defendant's barber-shop during the fall of 1879. Had often seen the prosecutrix come to the shop, and on one occasion saw her and the defendant go into the latter's bath room. Had seen her at the shop often before. He stated on cross-examination that the reason he thought the parties went into the bath room on the occasion spoken of was that the defendant asked witness for the key to the bath room, and the two went in that direction. He heard some one go into the bath room and lock the door, and some time after come out of the bath room and go off through the hall.

Clarence Higgins, who also worked for defendant, testified as positively as Homer to visits of the prosecutrix to the defendant's shop, and also that he had seen her go into the bath room with him.

*Wooldridge & Phillips*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

HURT, J. The appellant was tried and convicted of an aggravated assault and battery, charged to have been

made upon one Bama Jeffries, a female. In order to present clearly the point raised in the record, it is necessary to name the constituent elements of an assault and battery.

The use of any unlawful violence upon the person of another, with the intent to injure, is an assault and battery. From this, two acts must concur, one physical and the other mental,— the act and the accompanying intent. There must be a physical act done by the assailant, which takes effect upon the person of the party assailed. The slightest force is sufficient; the least touching of the person of another will suffice. The act done or force used which takes effect must be intended, otherwise it would be accidental and therefore not unlawful. To the intended act or force must be added the intent to injure the party assailed. The injury intended may be to the feelings or mind, as well as to the person. The violence being used or the act being done, if the natural consequence of the act or violence is an injury, the law presumes this injury to have been intended, unless it be shown that the intention was innocent and not culpable. When an injury is actually inflicted upon the person, the presumption that it was intended obtains. If to the mind, or feelings, the act or violence used must in its nature be calculated to wound or injure before the intention to injure will be presumed. When it is sought to convict for an injury to the feelings or mind, the character of a person assaulted with all of the surrounding facts become of vital importance in determining whether there was an intent to injure.

This is emphatically true with the case now before us. The facts constituting the assault and battery in this case, and relied upon by the State, are: "that the defendant took hold of the prosecutrix, and attempted to have carnal knowledge of her against her consent, thereby wounding her feelings." The issue was solely the intent

to injure her feelings. The defendant denied the intent, and also that there was in fact an injury inflicted upon the mind or feelings of this prosecutrix. The statement of facts shows the contest to have been over this fact,— did the defendant intend to wound the feelings of the prosecutrix? The acts or violence used upon the person of the prosecutrix being in their nature calculated to wound her feelings, the law would presume the intent. But this is not a conclusive presumption; it is open to proof, and the real fact may be shown. And as bearing directly upon this point, the defendant by attorney asked the witness Bama Jeffries, whether or not the defendant had ever had sexual intercourse with her prior to the time of the assault and battery. This was objected to by the county attorney upon the ground that the answer to such question would render the witness infamous. The court instructed the witness that she need not answer any question the answers to which would tend to criminate her. The witness refusing to answer, the defendant excepted.

It is the duty and province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer may disclose a fact which forms a necessary and essential link in a chain of testimony which would be sufficient to convict him of any crime, he is not bound to answer it so as to furnish matter for his conviction." "In such a case the witness must himself judge *what his answer will be,* and if he says on oath he cannot answer without accusing himself, he cannot be compelled to answer." *United States* v. *Burr,* 1 Rob. R. 207; *The People* v. *Mather,* 4 Wend. 254; *Floyd* v. *State,* 7 Texas, 215.

Under another rule upon this subject it is unnecessary to decide whether this question embraced an answer which would form a necessary link in the chain of evi-

dence required to convict of an offense. This could occur only in case of a prosecution for adultery; and under our Code this is rendered quite doubtful. The rule referred to is this: "A witness cannot be compelled to answer when his answer will subject him to a penalty, or will have a tendency to degrade his moral character, unless his evidence bears directly on the issue." *People* v. *Lohman*, 2 Barb. 216; *Lohman* v. *The People*, 1 Const. 379; *People* v. *Rector*, 19 Wend. 569.

Does the proposed question bear directly on the issue? Evidently it does. If so, the defendant was entitled to it; and the court should have compelled the witness to an answer of the question. The intention to wound the feelings of the prosecutrix being the issue, acts of lewdness between these parties were of the highest importance as tending to elucidate this, the only issue. Suppose the prosecutrix to have been a bawd or the inmate of a house of ill-fame, and this had been known to the defendant, could any sane person presume from the acts or violence, so called, used in this case, that there was an intention to insult her modest feelings and arouse her virtuous indignation? By no means. We have none so credulous. If the probabilities should be against the intent in the above case, certainly former acts of lewdness between the parties would be very material evidence tending to negative the intent to wound the feelings of the prosecutrix. Not only so, but these acts would tend to call in question,— raise a doubt,— of actual injury as well as the intent to injure. We are of the opinion, therefore, that the court below erred in not compelling the witness to answer the question.

We will not pass upon the sufficiency of the evidence to support the verdict, further than to observe that its intrinsic weakness intensified the error above noticed.

The judgment is reversed and the cause remanded.
*Reversed and remanded.*